A03A0982. REDDICK v. THE STATE.
A03A0983. SAMUELS v. THE STATE.
(591 SE2d 392)

SMITH, Chief Judge.

Adam R. Samuels and Demetrius Reddick were indicted by a Chatham County grand jury on charges of murder, felony murder, two counts of aggravated assault, four counts of possession of a firearm during the commission of a crime, theft by receiving, carrying a concealed weapon, carrying a pistol without a license, and reckless conduct. A jury found them guilty of the lesser included offense of voluntary manslaughter, two counts of aggravated assault, two counts of possession of a firearm during the commission of a crime, and reckless conduct and acquitted them as to two counts of firearm possession. The State nolle prossed the remaining charges. Samuels's and Reddick's amended motions for new trial were denied, and they appeal. Because the jury's verdict of guilty of reckless conduct as against one victim was factually inconsistent with its guilty verdict of aggravated assault as against the same victim, we reverse the convictions for aggravated assault and reckless conduct on Counts 4 and

12 of the indictment and remand them for a new trial. In all other respects, we affirm.

## Case No. A03A0982

1. Reddick asserts the general grounds. Construed in favor of the jury's verdict, the evidence shows that the deceased victim, a white male, was driving with a friend through a Savannah neighborhood on the afternoon of Christmas Day when he encountered two African-American teenage boys, brothers, riding on their bicycles. The driver and his passenger called the two teenagers vile and racially offensive names, and they responded in kind. The driver struck one of the brothers with his car, knocking him off his bicycle and causing scrapes and bruises. After the collision, the driver got out of the car and used threatening language toward the teenager who was still on the ground and then "took off."

About that time, Reddick and his older brother, Samuels, arrived on the scene in Reddick's distinctive car. While the injured teenager was taken to the hospital, his older brother got into the car with Samuels and Reddick, intending to get the license number of the victim's car. The teenager saw Reddick and Samuels both reach for a gun from behind the ashtray in the console and saw Samuels take the gun and put it in his lap.

After some time, they were able to see the car's license number, and Samuels wrote it down on Reddick's business card. Reddick pursued the other car at high speeds and the wrong way on a one-way street. Eventually the driver pulled over into an apartment parking lot, and he and his passenger spoke with Reddick. An eyewitness saw this confrontation as he was working on his car in the parking lot, and he was able to identify Reddick's distinctive car in detail, including a partial license number. After some heated discussion, in which the driver denied having hit the boy on the bicycle, the driver butted his head against Reddick's car, and he and his passenger got back in their car and drove away.

As the victims' car was leaving the scene, "[t]he passenger of the purple car . . . got out, and calmly raised his arm and pointed a gun and fired one shot and got back in the car." The bullet passed through the rear window of the victims' car and struck the driver in the back of his head, killing him. The teenager in Reddick's car testified that Reddick told Samuels, "Wet his a--," and Samuels "opened his door, stepped around the car, and fired." The teenager also testified that he never saw a weapon produced by the victims and that they never threatened to kill anybody in Reddick's car.

Reddick then drove home, switched cars, and took the teenager home. Later the same evening, the teenager located Reddick at a gas

station near his home and retrieved the business card with the license number on it. The next day, Reddick met a co-worker on the street, asked him to "hold something for him," and gave him a .380 caliber pistol. He also gave him part of a newspaper with a photograph of a car that the co-worker testified "was in a gutter that been in an accident or a shooting, I'm not exactly sure" and told him, "I want you to see this." Later that evening, the co-worker saw a story on television describing the other car involved in the shooting. He realized that it was probably Reddick's car and that "this might have been a weapon used in something, so I decided I wanted to get rid of it." He tossed it into the marsh, but after the police questioned him, he and two friends searched for and retrieved it, and his friends turned it in to the police. A firearms examiner for the state crime laboratory testified that the fatal bullet "was probably fired" from the recovered pistol.

Samuels testified and denied having been in the neighborhood of the shooting with Reddick, having an argument with anyone, engaging in a car chase, or shooting the victim. Reddick also testified and denied being at the scene or shooting anyone. Some alibi testimony was offered on the defendants' behalf by a neighbor and Reddick's parents but was vigorously challenged by the State and eventually contradicted by Samuels on cross-examination.

Reddick argues that the words "wet his a--" were not shown to be an instruction to shoot the victim. But the State specifically asked the teenaged passenger in Reddick's car, "What does that mean?" and the witness replied, "Shoot him." This argument is without merit. Reddick's further insistence that this witness was actually an accomplice is wholly unsupported by any evidence, as both Reddick and Samuels denied they were even at the scene. The teenager himself testified that he was riding with Reddick and Samuels in order to get the license number of the victim's car and that he saw no gun until it was pulled from behind the ashtray. While Reddick vigorously attacks the teenager's credibility and asserts that he is "an admitted felony-grade liar," these matters were "inherently for the jury's determination. This court cannot substitute its judgment on the issue of credibility for that of the jury." (Citations omitted.) *Smith v. State*, 237 Ga. App. 852, 853 (1) (521 SE2d 7) (1999).

Contrary to Reddick's contention, this witness's testimony was not the only evidence supporting his conviction. As Reddick acknowledges, "[c]riminal intent may be inferred from conduct before, during, and after the commission of the crime." (Citation and punctuation omitted.) *Hanifa v. State*, 269 Ga. 797, 809 (8) (505 SE2d 731) (1998). In addition to his command to shoot the victim, Reddick's actions in continuing to pursue the victims, switching cars, and attempting to dispose of the weapon by giving it to a friend along with a newspaper

story about the crime provide ample evidence of his participation in the crime under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Reddick asserts that the trial court erred in sustaining the State's objection to a voir dire question. Reddick's counsel asked, "Would you carry to a jurybox with you any prejudice against the defendant by reason of the fact that he is black and — ?" At this point the State interposed, "Objection, Your Honor. Objection." The court ruled, "I'll sustain the objection. That's not relevant."

This was error.[1] "The trial court erred by refusing to allow defense voir dire on the question of possible racial bias." *Legare v. State*, 256 Ga. 302, 304 (1) (348 SE2d 881) (1986). Given the interracial crime and the racially charged nature of the evidence in this case, the trial court should have allowed Reddick to ask this question. An error in denying a criminal defendant his statutory right to examine prospective jurors during voir dire is subject to harmless error analysis, and the burden is on the State to show that the error was harmless. *Henderson v. State*, 251 Ga. 398, 403 (2) (306 SE2d 645) (1983). The State essentially concedes that the trial court erred in sustaining its objection but argues that the error was harmless. Under the unusual circumstances presented by the facts of this case and the trial itself, we agree.

Some voir dire examination with regard to bias and prejudice did occur. The trial court asked the statutory questions concerning bias, prejudice, and impartiality. OCGA § 15-12-164. One juror responded, and she was further examined and eventually removed for cause because she had formed an opinion regarding the facts of the case.

At the hearing on the motion for new trial, the State presented testimony that the jury as impaneled had six African-American members, that the jury elected an African-American foreman, and that the trial judge is also African-American. Reddick's trial counsel testified that he extensively examined witnesses regarding the racial animosity of the victims despite the problem presented by his client's insistence on an alibi defense. He was pleased and surprised at the relatively large representation of African-Americans on the jury and acknowledged that he had no concerns that "any jury member might have some sort of racial agenda to push." He stated that "the only thing I had concern about the jury that was empaneled was whether or not some of the jurors had fixed opinion of the case . . . not so much on [the] racial thing, but the media coverage, that they had sympathy with the victims." Based on what he observed and the con-

---

[1] Reddick did not acquiesce in the error by failing to object further or except to the trial court's ruling. *Cherry v. State*, 230 Ga. App. 443, n. 2 (496 SE2d 764) (1998).

tact he had with jurors, he admitted that he did not feel "anyone on this jury was pushing a racial agenda in lieu of deciding the case on the facts of the case." He testified, "I was comfortable. I had five — from my understanding, five black females who wanted to acquit the guy until the Judge [gave] that *Allen* charge."

Moreover, as the State points out, the conduct of the victims was offensive in the extreme and unlikely to elicit any bias in their favor; in fact, by returning a verdict of voluntary manslaughter the jury apparently concluded that Reddick and Samuels were motivated by "a sudden, violent, and irresistible passion resulting from serious provocation," OCGA § 16-5-2 (a), despite their defense of alibi.

Finally, the evidence in this case was overwhelming. Reddick and Samuels did not assert any defense other than alibi; they testified that they were not at the scene, and their parents asserted that they had been at home all afternoon. The alibi testimony was vigorously challenged, however, and Samuels eventually admitted that he and Reddick did leave the house during the late afternoon, apparently without their parents' knowledge. In addition to the testimony from the teenager in Reddick's car regarding Reddick's involvement in the shooting, other witnesses testified to the involvement of Reddick's car in the chase and the confrontation's fatal outcome, as well as to his attempt to dispose of the weapon which probably fired the fatal shot. And the jury, after initially declaring it was unable to reach a verdict, acquitted Reddick of murder, instead finding him guilty of the lesser included offense of voluntary manslaughter. Under these circumstances, "we conclude it is highly improbable that the trial court's error in preventing voir dire questioning . . . had any impact upon the guilty verdicts in this case. Therefore, the error was harmless." *Napier v. State*, 276 Ga. 769, 774 (4) (583 SE2d 825) (2003).

3. Reddick asserts error in the trial court's limitation of the testimony of one of his alibi witnesses. But this action presents no error because it was the result of the late identification of the witness under OCGA § 17-16-5 (a). Under that Code section, Reddick was required to

> serve within ten days of the demand of the prosecuting attorney or ten days prior to trial, whichever is later, or as otherwise ordered by the court, upon the prosecuting attorney a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names, addresses, dates of birth, and telephone numbers of the witnesses, if known to the defendant, upon whom the defendant

intends to rely to establish such alibi unless previously supplied.

The afternoon of the day before trial, Reddick served the State with an untimely notice of four alibi witnesses that also failed to provide all the information required by statute. At the beginning of trial, the State objected to the witnesses, but the parties eventually agreed that the witnesses could testify based on a proffer of their testimony by defense counsel. After some discussion, the trial court deferred consideration of the matter until the proffer was made. After the State rested its case, the issue was discussed again, and Reddick's counsel made a proffer of the testimony of the witnesses. The trial court then instructed Reddick's counsel to caution the witnesses not to testify beyond the proffer given and warned "that if they go beyond that, I will berate them before this jury." Counsel left the courtroom and returned, reporting that he had so instructed the witnesses.

When the first witness took the stand, however, she testified with much greater specificity than the proffer, placing Reddick and his distinctive car at his home "about a quarter to five" when she went outside to warm up her truck. The State immediately called for a sidebar conference and objected, and the trial court instructed the jury to disregard any testimony regarding the specific time at which the witness saw the car.

Under OCGA § 17-16-6, if a defendant fails to comply with the requirements of the criminal discovery statute the trial court may "order the defendant to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the defendant from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances." This Code section gives the trial court "discretion to take any listed corrective action it deems appropriate." *Jones v. State*, 251 Ga. App. 285, 286 (1) (554 SE2d 238) (2001).

The trial court acted within its discretion and with the agreement of counsel in allowing the witness to testify based on counsel's proffer of her testimony. It was not required to grant a continuance to permit the State to interview the witness and investigate her allegations. *Jones*, supra. The trial court concluded that the witness had gone beyond the agreed-to testimony, that "it's not going to be trial by ambush here in this courtroom," and that granting a continuance after five days of trial and after the State had rested its case would be "ridiculous." After additional argument, the trial court noted that the case had been pending over a year and that no effort had been made to locate this witness, who lived across the street from Reddick. The trial court concluded that both bad faith and prejudice had been

shown and that this provided an adequate basis for the exclusion of the testimony. This was within the trial court's discretion, and it was not error to instruct the jury to disregard testimony that went beyond the agreed-upon proffer.

4. Reddick combines two enumerations of error in a single and somewhat convoluted argument. In essence, Reddick contends the trial court erred in entering judgments of conviction on the jury's mutually exclusive verdicts of guilty on the charges of aggravated assault (Count 4) and reckless conduct (Count 12) with respect to the surviving passenger in the victim's car. We agree.

The Supreme Court of Georgia has held that a charge of aggravated assault under OCGA § 16-5-21 based upon the "intent to commit injury" provisions of OCGA § 16-5-20 (a) (1) requires a criminal intent that is fatally inconsistent with the negligence required by a charge of reckless conduct under OCGA § 16-5-60 (b):

> An aggravated assault with a deadly weapon based on OCGA § 16-5-20 (a) (1) cannot be committed by criminal negligence. Proof of criminal intent is essential for a conviction of an (a) (1) assault. Reckless conduct, on the other hand, is an act of criminal negligence, rather than an intentional act, that causes bodily harm or endangers the bodily safety of another. It involves consciously disregarding a substantial and unjustifiable risk that a person's act or omission will cause harm or endanger the safety of the other person. Proof of criminal negligence is essential for a conviction of reckless conduct. Given the different elements of these two offenses, we have held that a verdict of guilty as to aggravated assault based on OCGA § 16-5-20 (a) (1) requires a finding of an intentional infliction of injury, which precludes the element of criminal negligence in reckless conduct. These cases recognize that the requisite mental states for these two offenses cannot logically and legally co-exist. Mutual exclusion means that a finding of guilt on the essential elements of one count by definition excludes a finding of guilt based on an essential element of another count. A finding of guilt on the essential element of criminal intent for aggravated assault based on OCGA § 16-5-20 (a) (1) thus excludes a finding of guilt based on the essential element of criminal negligence for reckless conduct.

(Citations, punctuation, footnote and emphasis omitted.) *Jackson v. State*, 276 Ga. 408, 411-412 (2) (577 SE2d 570) (2003). *Jackson* acknowledges that a conviction for aggravated assault based upon OCGA § 16-5-20 (a) (2) is not mutually exclusive of a conviction for

reckless conduct, because proof that an accused "[c]ommit[ted] an act which places another in reasonable apprehension of immediately receiving a violent injury" does not require criminal intent with regard to the victim. Id. at 412, n. 5. But if the indictment is sufficient to charge an accused with assault under either (a) (1) or (a) (2), and the verdict form does not specify under which subsection the jury returned its verdict, "we cannot conclusively state that the verdict rested exclusively on the subsection (a) (2) ground so as to eliminate the reasonable probability that the jury might have returned a mutually exclusive verdict." (Citation omitted.) Id. at 412-413, n. 5. When such mutually exclusive verdicts are entered "predicated upon reckless conduct in regard to the same act involving the same victim at the same instance of time[,] [cit.]," id. at 412, the judgment of conviction cannot stand.

The verdicts returned by the jury in this case with respect to Counts 4 and 12 are mutually exclusive in the same manner. The indictment asserted both "reckless conduct" in violation of OCGA § 16-5-60 (b) and aggravated assault in violation of OCGA § 16-5-21, without specifying whether the aggravated assault was made in an attempt to commit violent injury, OCGA § 16-5-20 (a) (1), or by placing another in reasonable apprehension of immediately receiving a violent injury, OCGA § 16-5-20 (a) (2). The jury's verdict states merely "COUNT FOUR. We the jury find the defendant guilty." Even though the trial court charged both parts of OCGA § 16-5-20 (a), under these circumstances, we cannot exclude the possibility that the jury found Reddick guilty of aggravated assault under OCGA § 16-5-20 (a) (1), thus impermissibly finding that he acted both with criminal intent and with criminal negligence at the same time with respect to the same victim.

While the State argues that the reckless conduct charge merged with the aggravated assault charge, this argument was implicitly rejected in *Jackson v. State*, supra. The Supreme Court reasoned that "to do so is to speculate about what the jury might have done if properly instructed, and to usurp the functions of both the jury and trial court." (Citation and punctuation omitted.) Id. at 413 (2). Under *Jackson*, then, we must therefore reverse both mutually exclusive convictions on Count 4 and Count 12 with respect to the surviving passenger and order a new trial. Id.

In the same section of his brief, Reddick also attempts to assert this argument with respect to his convictions for voluntary manslaughter and aggravated assault as to the victim driver. But this assertion is without merit because the count of reckless conduct was charged only with respect to the surviving passenger. See *Robinson v. State*, 254 Ga. App. 842-843 (1) (563 SE2d 919) (2002) (convictions for

aggravated assault and reckless conduct not mutually exclusive because charges involved different victims).

As part of the same argument, Reddick also contends that the trial court erred in refusing to instruct the jury on involuntary manslaughter as a lesser included offense. But

> [u]nder OCGA § 16-5-3 (a), involuntary manslaughter occurs where an unintentional death is caused "by the commission of an unlawful act other than a felony." . . . [Appellant] was, at the very least, engaged in the commission of an aggravated assault when the gun fired. Therefore, the trial court did not err by refusing to charge on felony involuntary manslaughter.

(Citation and emphasis omitted.) *Brooks v. State*, 262 Ga. 187, 188 (3) (415 SE2d 903) (1992). This contention is without merit as well.

5. Reddick complains that the trial court erred in failing to excuse two jurors for cause and in improperly rehabilitating them.

(a) Reddick contends Juror No. 36 should have been excused for cause after stating that she would "have a problem" being impartial because her daughter was robbed at gunpoint.

> Before a juror can be disqualified for cause, it must be shown that an opinion held by the potential juror is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. The decision to strike a juror for cause lies within the sound discretion of the trial court, and that decision will not be disturbed absent an abuse of discretion.

(Citations and footnotes omitted.) *Rocha v. State*, 248 Ga. App. 53 (1) (545 SE2d 173) (2001). The trial court's use of general questioning to force rehabilitation of a clearly biased and partial juror has been disapproved

> where the trial court coercively "rehabilitated" a prospective juror who had expressed well-founded doubts about being able to serve impartially because of a close relationship with one of the parties or because of extrajudicial knowledge of the events at issue. Cf. *Cannon v. State*, 250 Ga. App. 777, 778-780 (1) (552 SE2d 922) (2001) (conviction reversed where trial court rehabilitated juror who had a personal relationship with the victim and extrajudicial knowledge of the rape)[, overruled in part on other grounds, *Jackson v. State*, 254 Ga. App. 562, 566 (4) (562 SE2d 847) (2002)];

*Walls v. Kim*, 250 Ga. App. 259 (549 SE2d 797) (2001) (wrongful death judgment reversed where trial court rehabilitated juror, a nurse, who had worked with the defendant doctor and stated she would favor the doctor in the litigation)[, aff'd, *Kim v. Walls*, 275 Ga. 177 (563 SE2d 847) (2002)].

*Torres v. State*, 253 Ga. App. 318, 320 (2) (558 SE2d 850) (2002). In contrast, "a juror who expresses a willingness to try to be objective and whose bias arises from feelings about the particular crime as opposed to feelings about the accused may be eligible for service." *Ivey v. State*, 258 Ga. App. 587, 593 (2) (574 SE2d 663) (2002).

This juror did not express any bias with regard to the defendants. Her reservations were based upon her personal experience with regard to an unrelated crime. After being asked by the trial court if she could listen to the evidence, "put aside your personal experience and be able to decide this case based on the evidence," she responded, "I think I could do that. . . . Based on the evidence." Under these circumstances, we cannot say that the trial court abused its discretion in refusing to strike this juror for cause.

(b) Reddick also contends Juror No. 26 should have been excused for cause after stating that she "guess[ed]" she had formed an opinion from hearing about the case in the media. But this juror testified that she had only fragmentary knowledge about the case and "I might not even have the right case in my mind." Asked if she had formed an opinion, she responded, "I guess I did," but qualified that by saying, "I don't know . . . what was in the paper was correct or whatever." Asked if she could set aside "that impression you got about this case" and decide the case based on the evidence, she responded, "I think I could." On further questioning by Reddick's counsel, she stated that she had formed an opinion based on the news story. Reddick then challenged for cause, contending that the juror had stated "she already has a fixed bias." The trial court disagreed with this characterization of the testimony, and the juror was questioned again. The juror testified that she had formed an initial opinion with regard to the case, but her opinion was not set or fixed to a point that she would ignore or disregard the evidence: "No, I wouldn't ignore it. I would listen." She agreed that she would listen to the facts and the law and make her decision based upon what she heard in court and the charge from the judge. Her initial opinion was formed not on personal knowledge of the defendants or the facts of the case, but merely upon hearsay, and in order to disqualify her from service that opinion must have been " 'so fixed and definite that it would not be changed by the evidence or the charge of the court during the trial of the case. [Cit.]' " *Gibbins v. State*, 229 Ga. App.

896, 899 (3) (495 SE2d 46) (1997). Like the juror in *Gibbins*, here "[t]he prospective juror testified that she could put aside any prior impressions and fairly and impartially decide the case on the evidence presented at trial. Thus, she was not subject to a successful challenge for cause." (Citations and punctuation omitted.) Id.

6. While Reddick contends the trial court erred in excusing for cause Juror No. 16, this juror presents the contrasting situation of personal knowledge of the accused. The juror, a teacher, knew Reddick personally for four years and taught him in the tenth grade. She testified that she did not know if she could set her feelings aside because she "loved him to death" and did not believe he committed the offense "because I know him so well." Eventually, when the trial court asked the juror whether she had formed an opinion, she answered, "I think, yes." This is precisely the bias based on actual knowledge of the parties discussed in *Torres*, supra, and *Ivey*, supra. The trial court did not abuse its discretion in striking this juror for cause.

7. Reddick also contends the trial court erred in excusing a second juror for cause. But we will not consider this enumeration of error because this juror was never identified by name or by number in the transcript or the record, and some of his responses were inaudible. Moreover, this unidentified juror flatly denied that he could listen to the evidence and the charge and render a fair and just verdict. He further testified that he could not "have somebody['s] . . . life in my hands. Can't do it." Asked by the court if he could simply determine the facts of the case based upon the evidence, he responded, "No, I couldn't do it." He reiterated that he could not sit as a juror under any circumstances. Further voir dire revealed that he had been a criminal defendant, felt that he had been unfairly treated, and did not want to take the risk of finding someone guilty who was actually innocent: "I don't want that on my conscience." Voir dire by Reddick's counsel did not reveal any retreat from this position or any indication that he could decide the case based upon the evidence and the law. Reddick has not shown that the trial court abused its discretion in excusing this juror for cause.

8. Reddick's three remaining enumerations of error allege ineffective assistance on the part of his trial counsel with respect to the testimony of his first alibi witness. He contends trial counsel failed to investigate the existence of the alibi witness in a timely manner, failed to file the appropriate notices in a timely manner, and failed to request that the State's motion regarding the alibi witness be heard outside the presence of the jury.

In order to prevail on a claim of ineffective assistance, Reddick must show both that counsel's performance was deficient and that but for this deficiency, the outcome of the trial would have been dif-

ferent. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Failure to satisfy either prong of the *Strickland* standard is fatal to an ineffective assistance claim. See generally *Brewer v. State*, 224 Ga. App. 656, 657-658 (2) (481 SE2d 608) (1997). "The trial court's determination with respect to effective assistance of counsel will be affirmed unless the trial court's findings are clearly erroneous. [Cit.]" *Chapman v. State*, 273 Ga. 348, 350 (2) (541 SE2d 634) (2001).

As Reddick acknowledges, the trial court's decisions on matters of credibility on motion for new trial will not be lightly disturbed by this court. While Reddick points to his mother's testimony that trial counsel did nothing to investigate this witness, trial counsel himself testified that he undertook considerable efforts to find her but that Reddick's family members did not cooperate despite their promises to identify and locate the witness. He also testified that he did not want to file the notice until he knew what the alibi witness was going to say, because "I don't like to be filing things when I haven't talked to somebody. It can come back and backfire on me." Trial counsel also testified that the State waived the notice requirement when they met in chambers and agreed on the proffer. The conflicting testimony of Reddick's trial counsel and his mother regarding the search for alibi witnesses presents squarely an issue of credibility for the trial court. Its decision is supported by the record, and we cannot say that it was clearly erroneous. *Brown v. State*, 225 Ga. App. 49, 52 (1) (483 SE2d 318) (1997).

Reddick also complains that his trial counsel should have moved to send the jury out during the hearing on the State's motion for sanctions on the discovery violation. But when the trial court called a sidebar conference on the State's motion on the discovery violation, Samuels's counsel moved for a hearing outside the presence of the jury, and the jury was sent out. Any motion on Reddick's part would have been superfluous. After the ruling and instruction to the jury on the discovery violation, Reddick contends that the trial court made improper comments before the jury and that his trial counsel failed to object. But Reddick did not enumerate this alleged ineffective assistance as error. Moreover, in general, the "remarks of a judge assigning a reason for his ruling are neither an expression of opinion nor a comment on the evidence." (Punctuation and footnote omitted.) *Little v. State*, 260 Ga. App. 87, 90 (4) (579 SE2d 84) (2003). Finally, Reddick did not question his trial counsel regarding either of these issues at the hearing on the motion for new trial, and trial counsel's actions therefore are presumed strategic. *McFarlin v. State*, 259 Ga. App. 838, 841 (4) (578 SE2d 546) (2003).

*Case No. A03A0983*

9. Samuels asserts error with regard to the voir dire question posed by Reddick and objected to by the State. But we do not reach the issues raised with respect to Reddick in Division 2, because Samuels failed to preserve this issue for appeal. As a general rule, a party need not object or take exception to a ruling by a trial court sustaining an objection. *Cherry v. State*, 230 Ga. App. 443, n. 2 (496 SE2d 764) (1998). The voir dire question was asked by Reddick, however, and Samuels never adopted Reddick's questions and did not raise any exception or otherwise establish himself as aggrieved by the disallowance of the question. Samuels relies upon *Ford v. State*, 200 Ga. App. 376 (408 SE2d 166) (1991), in which the trial court sua sponte disallowed a voir dire question, and defense counsel "thanked the . . . court and moved on." Defense counsel was permitted by this court to raise the error on appeal. Id. But *Ford* has been overruled by the Supreme Court of Georgia in *Plaza Properties v. Prime Business Investments*, 273 Ga. 97 (538 SE2d 51) (2000), which concluded that *Ford* was wrongly decided and stated "if a party has not voiced his or her position with regard to a trial court's ruling before it is made, the party must do so once the court makes the ruling. Accordingly, we overrule the holding in *Ford*." *Plaza*, supra at 102. Under the Supreme Court's analysis in *Plaza*, Samuels's failure to adopt Reddick's voir dire question is fatal to his claim on appeal.

10. For the reasons stated in Division 4, we reject Samuels's contention that the trial court erred in refusing to charge on involuntary manslaughter, but we reverse Samuels's convictions on Counts 4 and 12 with respect to the victim passenger and remand for a new trial.

11. Samuels complains that the trial court failed to instruct the jury that it could find him not guilty on the homicide counts. But the trial court instructed the jury in its pre-trial and post-trial charges regarding the presumption of innocence and reasonable doubt. It repeatedly instructed the jury that the State must prove the defendants' guilt beyond a reasonable doubt, that "[i]f you do not believe the defendant is guilty or if you have any reasonable doubt as to the defendant's guilt, it would be your duty to acquit the defendant," and that "grave suspicion" or "speculation or conjecture" is not sufficient to authorize a conviction.

> [T]he charge must be considered as a whole, and it is clear that the court fully instructed the jury on the issues of burden of proof, reasonable doubt, and the presumption of innocence. There was no requirement that the court repeat such instructions specifically before mention of the lesser in-

cluded offenses nor was there any request by defendant that it do so.

(Citations omitted.) *Laymac v. State*, 181 Ga. App. 737, 740 (3) (b) (353 SE2d 559) (1987).

12. Finally, Samuels alleges ineffective assistance of trial counsel in several respects.

(a) Samuels alleges ineffective assistance in his trial counsel's failure to take exception to the exclusion of the voir dire question asked by Reddick and considered in Divisions 2 and 9. But Samuels's trial counsel asserted most emphatically that he deliberately chose not to ask that question as a matter of strategy: "I don't need to ask that question. This is Savannah, Georgia. I was born and raised here. There's racial prejudice on that jury, even after September 11th, 2001. I don't see any sense in going into it. I get rid of the people I can't handle." Trial counsel's conduct of voir dire was a matter of strategy and tactics, and Samuels did not carry his burden of establishing ineffective assistance. *Morgan v. State*, 276 Ga. 72, 77 (9) (575 SE2d 468) (2003).

(b) Under our holding in Division 4, Samuels was not entitled to a charge on involuntary manslaughter. Counsel therefore was not ineffective in failing to request such a charge. *Rogers v. State*, 247 Ga. App. 219, 230 (14) (a) (543 SE2d 81) (2000).

(c) Samuels also contends his trial counsel was ineffective in failing to object to Reddick's request to charge on "mere presence." Trial counsel for Samuels agreed that the charge on mere presence requested by Reddick seemed inconsistent with the defense of alibi and that he did not want it in the case. He also noted, however, that the charge on voluntary manslaughter was inconsistent with the alibi defense as well, but all the parties (including the district attorney) sought and obtained it. The parties agreed to this inconsistent charge, and failure to object to it has not been asserted as error. Samuels has not demonstrated that interposing an objection to Reddick's request to charge on mere presence, when the jury was already instructed as to voluntary manslaughter, would have affected the outcome of his trial.

(d) Samuels asserts his trial counsel was ineffective in failing to present additional character evidence. But trial counsel testified that he did not put up character witnesses because he did not think it would be effective and that he believed Samuels himself was "as strong as anybody that we could put up." Decisions about which witnesses to call are "a matter of trial strategy and . . . tactical errors do not [amount to] ineffective assistance of counsel." (Punctuation and footnote omitted.) *Williams v. State*, 253 Ga. App. 453, 455 (1) (a) (559 SE2d 512) (2002).

(e) Finally, Samuels contends his trial counsel was ineffective in failing to move for a separate sentencing hearing, contending that he was harmed by the testimony of some of the witnesses for Reddick because they insisted the defendants were innocent. He also contends his trial counsel inadequately prepared the witnesses by failing to instruct them not to mention their belief in the defendants' innocence. Although the witnesses were cautioned by Reddick's counsel not to assert the defendants' innocence, they did so anyway. Asked why he did not ask for separate sentencing, Samuels's counsel responded, "Quite frankly, I didn't think it would be as bad as it was."

We assume without deciding that some authority exists to request a separate sentencing hearing after a joint trial without a motion to sever, although Samuels has provided none. But since the evidence on sentencing is heard by the trial court, Samuels does not explain how separate hearings would have prevented the trial court from hearing the same evidence that he contends damaged him. He has not shown that a motion to sever the sentencing hearings would have been successful or that it would have changed the outcome of the trial. The trial court did not err in denying Samuels's motion for new trial on the basis of ineffective assistance of counsel.

*Judgments affirmed in part and reversed in part. Ruffin, P. J., and Miller, J., concur.*

DECIDED NOVEMBER 18, 2003 —
RECONSIDERATION DENIED DECEMBER 2, 2003 — ▬▬▬▬▬

*Thomas J. Gustinella*, for appellant (case no. A03A0982).

*Jackson & Schiavone, Steven L. Sparger*, for appellant (case no. A03A0983).

*Spencer Lawton, Jr., District Attorney, George R. Asinc, Assistant District Attorney*, for appellee.