S04P1039. RILEY v. THE STATE.
(604 SE2d 488)

HINES, Justice.

A jury convicted William David Riley, Sr., of three counts of malice murder and two counts of first-degree arson. The murder victims were Riley's three young children. The jury recommended a death sentence for each murder after finding beyond a reasonable doubt seven statutory aggravating circumstances. OCGA § 17-10-30 (b) (2), (7). The trial court denied Riley's motion for new trial, and he appeals. We affirm the convictions and sentences.[1]

---

[1] Riley committed the crimes on August 16, 2000. A Newton County grand jury indicted him on November 6, 2000, for malice murder (three counts), felony murder (three counts), and first-degree arson (two counts). The State filed its notice of intent to seek the death penalty on December 5, 2000. After a change of venue, Riley's trial took place February 17-24, 2003. The jury convicted Riley on all counts and recommended three death sentences for the malice murders. In addition to the death sentences, the trial court sentenced Riley to 20 years for one of the arson convictions. Apparently the other arson conviction merged with it. The three felony murder convictions were vacated by operation of law. Riley filed a motion for new trial on March 14, 2003, which he amended on December 19, 2003. The trial court denied the motion for new trial as amended on January 20, 2004, and Riley filed his notice of appeal on January 22, 2004. The case was docketed with this Court on March 2, 2004, and orally argued on July 19, 2004.

1. The evidence presented at trial showed the following: at approximately 10:45 a.m. on August 16, 2000, a fire broke out in a trailer at the Pine Valley Mobile Home Park. The trailer was rented by Riley, who lived there with his girlfriend, Jacque, and his three children, six-year-old Ashley, five-year-old William, and three-year-old Samantha. Riley's friend, Wayne Atnip, was also living there and sleeping on a couch. All three adults escaped the fire. All three children died.

Neighbors and firefighters reported odd behavior by Riley during the fire. They testified that he did not try to save his children and that his demeanor was cold, unemotional, and dry. While the trailer was burning, and before the firefighters arrived, he ran to the back of the trailer, yelled for his children to awake, banged on the outside wall a few times, and then moved his car away from the trailer. He was the only adult who escaped the fire fully dressed. He had some ash and soot on his face and in his nose, but no burns on his hands, arms or anywhere on his body.

Witnesses testified that Riley rarely interacted with the children and had used derogatory names when referring to them. He had made threats to kill them to a prior girlfriend if she called the Department of Family and Children Services ("DFACS"). Riley's wife, the mother of the victims, moved out in May 2000 and Riley was in dire financial straits. He had been denied welfare benefits and was facing eviction; the eviction hearing had been scheduled for August 18. A neighbor heard Riley tell Jacque that he would kill the children before he would let DFACS take them. He also said he would burn the trailer before he would be evicted. In an argument with Jacque three days before the fire, another neighbor heard Riley say he wished Jacque and the children were dead. Neighbors also testified that Riley and Jacque had a loud argument outside the trailer a few hours before the fire started.

One of the firefighters at the scene of the fire asked Riley if the children could have obtained a cigarette lighter and Riley insisted that was not possible because "we keep them put up." Riley suggested a short circuit as the fire's possible cause. The police tape-recorded an interview with Riley at the scene in which he said that he had been facing eviction because he had refused to pay his rent due to the trailer's electrical problems, including exposed wires and cracked light fixtures. He said the adults had awakened that morning too late to go to work so everyone but he had gone back to sleep. Riley drank coffee and read; his children woke up and he fed them and then sent them back to their room to play. He went to the children's room at 10:30 a.m. and told them to get dressed. There were no interior doors in the trailer, except one to the bathroom. Riley and Jacque had tacked a sheet over the doorway to the master bedroom. He went to

the master bedroom and dressed; Jacque was just waking up. As he was putting on his second boot, he heard three-year-old Samantha scream, "Daddy, help me!" He ran into the hallway and saw smoke. He went to the doorway of the children's bedroom and saw flames on the far wall of the room behind his son's bed. The children's room had two twin-sized beds that filled almost the entire room; the room was 9′ 1″ by 7′ 8″ and the corner of the nearest bed was only 2.5 feet from the entrance to the room. Riley, who is 6′ 5″ tall, said he could not see his children through the smoke so he reached into the room and stepped on a bed to try to reach them. He was unable to do this because the heat was too intense, so he went outside, picked up a piece of wood, and threw it through the children's window. He knew it was over when the screaming stopped and flames started coming out the window. He then moved his car because he was afraid it might explode.

A state arson investigator concluded that the fire had been intentionally set; it had started in the children's bedroom near the center of the trailer, exited this room, and traveled down the hall to the living room. No cigarette lighter was found in the children's room, where the three bodies were discovered. The investigator found no problems with the electrical system; electrical shorts will melt wire with a "beading" effect similar to the effect of welding on metal but no such beading of the wires in the trailer was found. He also found no problems with the electrical appliances. An electrician who inspected the trailer for the county in May 2000, just before Riley moved in, agreed that the wiring was not defective and that almost all the light fixtures had been recently replaced. The landlord and the mobile home park maintenance worker testified that Riley had never complained about any electrical problems or faulty wiring in his trailer. The police found a cigarette lighter on the ground eight feet from the trailer.

On the night of August 16, Riley drove to the sheriff's office for another audiotaped interview. When a GBI agent confronted him with his belief that Riley was not telling the truth about the fire, Riley stated, "My son plays with lighters. Okay?" Riley said he left a lighter out that he thought was empty and that his son must have found it, shook it, and started the fire in the children's room. He also asserted that he was asleep when the fire started and he first heard Samantha screaming, but the agent reminded him that he had earlier said he was getting dressed. When the agent pointed out that Riley said he had gone into the children's small bedroom to try to save them, but that his arm hair was not even singed, Riley then said he had not gone into their room. Eventually, Riley admitted that, while the children were sleeping and to scare Jacque, he used a cigarette lighter to set fire to the bedding on the corner of his son's bed. When he returned to

the children's room two or three minutes later, he saw that his son had jumped to the girls' bed "and they started coughing and hacking and everything else and the heat from that fire just got 'em."

The evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt Riley guilty of three counts of malice murder, three counts of felony murder, and two counts of arson in the first degree. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The trial court did not err by denying Riley's motion for a directed verdict of acquittal. See *Raulerson v. State*, 268 Ga. 623 (1) (491 SE2d 791) (1997); OCGA § 17-9-1 (a). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the existence of the statutory aggravating circumstances which support his death sentences for the malice murders. *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2).

2. Riley claims that his death sentences must be vacated because the State did not allege in the indictment the statutory aggravating factors that supported them. This Court has decided this issue adversely to him. *Terrell v. State*, 276 Ga. 34 (5) (572 SE2d 595) (2002).

3. Riley's second statement was not the product of an illegal arrest nor was it involuntary. Riley drove to the sheriff's office on August 16 and agreed to be interviewed. The police read him his *Miranda (v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966)) rights and he executed a written waiver of them. Riley was 31 years old, has an eleventh grade education, and has average intelligence. He was lucid, sober, and appeared to understand his rights and the waiver. The interview lasted less than two hours and was audiotaped. His incriminating statement was reduced to writing and he signed each page. The evidence shows that Riley was free to leave until he admitted setting the fire that killed his children. Although the interview became confrontational and the officers repeatedly accused Riley of lying, they neither made threats nor promises to him. They did suggest to Riley that Jacque had "dumped it on poor old Bill," which was not true, but this suggestion was not calculated to produce an untruthful response. See *DeYoung v. State*, 268 Ga. 780 (8) (493 SE2d 157) (1997); *State v. Ritter*, 268 Ga. 108 (1) (485 SE2d 492) (1997). In fact, the officers spent a considerable portion of their questioning trying to convince Riley to incriminate Jacque, but in the end he only incriminated himself. The officers' bluff that scientific evidence would tell them exactly what happened in the trailer also did not make Riley's statement inadmissible, even considering that they admitted at the pretrial hearing that they had overstated their investigative capability. See id. Considering the totality of the circumstances, we conclude that the trial court did not err by finding

that Riley's second statement to the police was voluntary and admissible. See *Lee v. State*, 270 Ga. 798 (2) (514 SE2d 1) (1999); *DeYoung*, supra; OCGA § 24-3-50.

4. Riley alleges that the trial court erred by limiting the testimony of Dr. Stark, a psychologist called to testify by Riley, regarding Riley's susceptibility to giving a false confession due to the police interrogation technique utilized. Dr. Stark tested and evaluated Riley before trial. Although a defendant's statement may be determined to be voluntary in a pretrial hearing, "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Crane v. Kentucky*, 476 U. S. 683, 689 (106 SC 2142, 90 LE2d 636) (1986). The record clearly shows that the jury was fully apprised of the psychological environment under which Riley gave his statement. Dr. Stark testified about Riley's personality traits that made him submissive and "easily led" and Riley's sister testified about his willingness to give in when falsely accused of truancy by his father. The jury also heard Riley's audiotaped statement.

However, the trial court refused to allow Dr. Stark to testify before the jury about false confession theory in order to show that the police interview technique could have led Riley to falsely confess. Riley alleges that this refusal was error. The trial court held a hearing on Dr. Stark's proposed testimony regarding false confession theory. Dr. Stark testified that he became conversant about the issue of false confessions after being retained in the case; he had never testified before a jury about false confession theory and knew of no expert who had done so in a Georgia court. He stated that literature on this subject shows that some police interview techniques "sometimes elicit confessions that hold up later on, but we also know that there are cases where they lead to what later on are shown to be false confessions." He could not determine the frequency of elicited false confessions and stated that the literature "was not even saying that most confessions are false," but he proffered that in his professional opinion the interview technique employed by the officers in this case could have generated a false confession.

Dr. Stark also testified that his knowledge of the subject was derived from reading five articles about false confession theory. All of the articles had been recently published, with the first being published in 1988.[2] Dr. Stark admitted that the theory is "mainly anecdotal" and that most of the specific examples of false confessions in the articles involved police threats or coercion, suspects who were

---

[2] The five articles were copied and placed in the record.

juveniles or mentally retarded, or interrogations that lasted for ten or more hours where the suspect was isolated and deprived of sleep. Dr. Stark also admitted that some of the articles have been professionally criticized and that one critic has asserted that some of the allegedly false confessions cited were not in fact false. When asked if the false confession theory had reached a verifiable stage of scientific certainty, Dr. Stark replied:

> I don't think it's going to reach a verifiable study stage of scientific certainty until a number of years go by and we know more, do more research. We need much more research and more experience with it. I think all the writers that I have read so far agree that the phenomenon happens, we just don't know how often.

When the trial court asked what his testimony about false confessions would supply that is outside the common knowledge of jurors, Dr. Stark answered, "I guess to simply let the jurors know that this phenomenon does occur and it's being studied and it is in its infancy."

The trial court did not err by limiting Dr. Stark's testimony concerning false confession theory. Contrary to Riley's assertion at trial and on appeal, the knowledge that a false confession can be obtained from a suspect by police is not beyond the ken of the average juror; this knowledge is implicit in the jury charges on the voluntariness, credibility, and corroboration of a defendant's statement to the police. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (3rd ed.), pp. 21-23; OCGA §§ 24-3-50; 24-3-53. With regard to whether certain police interview techniques may result in a greater likelihood of false confessions by the person being interrogated, the trial court examined Dr. Stark's proposed testimony on this subject and read the articles that formed the only basis of his knowledge of the theory (see *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982)), and the court concluded, as did Dr. Stark, that false confession theory has not reached a verifiable stage of scientific certainty. See id. Further, the theory relies almost exclusively on anecdotal evidence and the anecdotal evidence contained in the articles mainly involved suspects who were juveniles, or who were mentally retarded, or who were interrogated for many hours, none of which applies to Riley. Dr. Stark also admitted that false confession theory is in its infancy and that more research is needed to establish its reliability. In fact, the author of an article cited by Dr. Stark and made part of the record concluded:

> The false confession theory needs further study and refinement. Consequently, the admission of expert testimony based

on this new theory is premature and therefore unreliable. Currently, the empirical base that supports the theory has too many unanswered questions, no known error rate, and just one laboratory experiment to back it up. This foundation cannot support reliable conclusions just yet.

"The Admissibility of False Confession Expert Testimony," Major James R. Agar II, *The Army Lawyer*, August 1999, p. 42. The trial court did not abuse its discretion by refusing to allow expert testimony on false confession theory. See *Johnson v. State*, 272 Ga. 254, 257 (1) (526 SE2d 549) (2000) ("[T]he admission or exclusion of [expert testimony] 'lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion.' [Cit.]"); *Harper*, supra at 525-526.

The trial court also excluded part of Dr. Stark's testimony regarding whether Riley's lack of emotion may be attributable to his personality, partly because it determined that Riley's counsel had not complied with the discovery obligations of OCGA § 17-16-4 (b) (2) (defense must provide prosecutor, before trial, with report of mental health examination, including summary of the basis for the expert opinion rendered in the report).[3] See OCGA § 17-16-6; *Reddick v. State*, 264 Ga. App. 487, 492 (3) (591 SE2d 392) (2003) (trial court may limit a defense witness's testimony due to a violation of OCGA § 17-16-1 et seq.). Pretermitting whether there was sufficient bad faith and prejudice shown to authorize this exclusion, see *Reddick*, supra at 492-493, we conclude that any error would be harmless in light of all the other evidence. See *Blair v. State*, 273 Ga. 668, 669-670 (4) (543 SE2d 685) (2001). Lastly, the trial court did not err by finding Dr. Stark's proposed testimony on false confession theory inadmissible in the penalty phase. See *Gissendaner v. State*, 272 Ga. 704 (12) (532 SE2d 677) (2000) (although evidentiary rules are relaxed in the

---

[3] Riley had opted into OCGA § 17-16-1 et seq., which imposes reciprocal discovery obligations on both the State and the defense. The trial court stated with regard to the excluded testimony:

[T]hat was one of the reasons why I withheld it, because I found your notice provisions had not been complied with in the discovery statute. . . .

\* \* \* \*

[A]ll the test results were not completely given until actually during the actual testimony of [Dr. Stark] on the stand while this jury was out, because the State didn't even have all — I think the social tests, the State had not been given and there was, in all this confusion about well, we kind of thought we had given it to you. I don't really think that's the way they contemplated that the statutes were meant to be; that we do this haphazard kind of slap-dash method during the actual trial of the case.

penalty phase, the trial court may exclude evidence that is unreliable).

5. Riley claims that evidence seized from his destroyed mobile home pursuant to search warrants executed weeks after the fire should have been suppressed. The trial court determined that no search warrants were needed because Riley did not have a reasonable expectation of privacy in his destroyed rental trailer. See *Pervis v. State*, 181 Ga. App. 613 (1) (353 SE2d 200) (1987). The United States Supreme Court has addressed the extent of a defendant's privacy interest in fire-damaged property:

> Privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders. Some fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations. The test essentially is an objective one: whether "the expectation [is] one that society is prepared to recognize as 'reasonable.'"

(Punctuation omitted.) *Pervis*, supra at 614 (1), quoting *Michigan v. Clifford*, 464 U. S. 287, 292 (III) (A) (104 SC 641, 78 LE2d 477) (1984). In *Pervis*, supra, the Court of Appeals found that no reasonable privacy interest remained in a burnt house where only a chimney continued standing, no personal belongings remained in the destroyed structure, and the owner made no attempt to secure the ruins. The items seized during the search "were simply exhumed from an openly visible pile of ashes and rubble." *Pervis*, supra. In this case, photographs show that Riley's trailer home was completely destroyed. Most of the roof and walls were collapsed or burnt away. None of Riley's possessions remained in the trailer and he told the police on August 16 that all he had left was his car and the clothes on his back. Riley made no attempt to secure the premises. The trial court did not err by finding that Riley no longer had a privacy interest in the mobile home. See id. Compare *Carr v. State*, 267 Ga. 701 (7) (482 SE2d 314) (1997) (Carr's house not destroyed and he had taken measures to secure it). Additionally, the search warrants were valid and supported by probable cause. See *Coleman v. State*, 271 Ga. 800 (4) (523 SE2d 852) (1999). Lastly, the cigarette lighter Riley complains was improperly admitted into evidence was not found pursuant to the warrants; it was found on the day of the fire outside the trailer lying on the ground. This complaint is without merit.

6. Riley complains about the scope of jury voir dire, the death penalty qualification of prospective jurors, and the trial court's qualification or disqualification of certain prospective jurors.

A. *The scope of the jury voir dire.* Riley claims that the trial court improperly restricted voir dire and that this restriction prevented him from sufficiently ascertaining the views of the prospective jurors as to the death penalty. A review of the transcript does show that the court was too restrictive at the beginning of voir dire. During the voir dire of prospective juror Browning, the first prospective juror to be questioned individually, Riley's counsel attempted to ask whether Browning was "inclined to one type of sentence or another for murder?" The State objected and the court disallowed this question as calling for "prejudgment." This was error, as each party in a death penalty case is authorized to inquire about whether a prospective juror is predisposed to a particular sentence for a defendant (any defendant, not the particular defendant on trial) who is convicted of murder. See *Zellmer v. State*, 272 Ga. 735 (1) (534 SE2d 802) (2000); OCGA § 15-12-133. However, the record reveals that Riley did not object to the court's preventing him from asking such questions of Browning. Therefore, this claim is not preserved for appeal with regard to her. See *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992) ("Errors not raised in the trial court will not be heard on appeal."). After the voir dire of prospective juror Browning, the parties and the trial court had a long discussion about what constituted prejudgment. The trial court finally stated, "I will let you ask your questions and I will listen to objections, if any objections, but I am still saying, y'all do what you want to." Thereafter, Riley was permitted to ask each prospective juror, on individual voir dire, if he or she was predisposed to a particular sentence in a murder case. Our review of the voir dire, after prospective juror Browning, shows that Riley was permitted to ask questions sufficient to ascertain the fairness and impartiality of the prospective jurors. See *Sallie v. State*, 276 Ga. 506 (3) (578 SE2d 444) (2003); *Lawler v. State*, 276 Ga. 229 (6) (576 SE2d 841) (2003). The scope of jury voir dire is largely left to the trial court's sound discretion and the court did not abuse this discretion after prospective juror Browning was questioned.[4] See id.

B. *The death penalty qualification of prospective jurors.* "Qualifying prospective jurors on the basis of their death penalty views is not unconstitutional." *Braley v. State*, 276 Ga. 47, 52 (21) (572 SE2d 583) (2002). See also *DeYoung*, 268 Ga. at 790 (11).

C. *The qualification of certain prospective jurors.* Riley complains that the trial court erroneously refused to excuse prospective jurors Bryan, Burnette, and Hanson for cause even though they were

---

[4] Juror Browning's responses do not show her to be disqualified. Neither party moved to excuse her for cause, nor did they exercise a peremptory challenge to remove her. She served on the jury.

allegedly biased in favor of a death sentence. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' [Cit.]" *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997). "A prospective juror who has an unwavering bias in favor of one of the possible sentences authorized by law, to the exclusion of at least one of the other possible sentences, is not qualified to serve." *Sallie*, 276 Ga. at 508 (2). See also *Lance v. State*, 275 Ga. 11 (8) (560 SE2d 663) (2002). As an appellate court, we pay deference to the trial court's resolution of any conflicts or equivocations in a prospective juror's voir dire responses as well as to that court's ultimate determination of the juror's qualification. See *Greene*, supra at 49. The record shows that prospective jurors Bryan and Burnette would consider all three sentencing options despite some equivocation. The trial court did not abuse its discretion by finding them qualified to serve on the jury. See *Sallie*, supra at 508-509 (2) (a); *Greene*, supra. Contrary to Riley's assertion, the trial court did excuse prospective juror Hanson for cause so the complaint regarding him is moot.

Riley claims that the trial court erroneously excused prospective jurors Price and Woodburn for cause because their voir dire responses qualified them to serve. Prospective juror Price stated that he was opposed to the death penalty and could not vote to impose a death sentence. The trial court did not err by excusing him for cause. See *Greene*, supra at 50. Moreover, Riley's trial counsel agreed with the court that prospective juror Price was disqualified from serving on the jury because of his views against the death penalty. See *Rhode v. State*, 274 Ga. 377 (7) (552 SE2d 855) (2001). The record discloses that prospective juror Woodburn was not excused for cause as contended by Riley; the State used a peremptory challenge to excuse her. Therefore, this argument concerning her is moot.

7. The trial court admitted photographs of the victims' bodies at the crime scene and Riley complains that they were unduly prejudicial and inflammatory. The photographs admitted were relevant and admissible to show the nature and extent of the injuries to the victims and the locations and positions of the bodies in the bedroom and on the beds. See *Heidler v. State*, 273 Ga. 54 (6) (537 SE2d 44) (2000); *Jackson v. State*, 270 Ga. 494 (8) (512 SE2d 241) (1999). Upon objection by Riley, the State decided not to tender photographs of the bodies taken after their arrival at the morgue since they were arguably cumulative of the crime scene photographs. We find no error.

8. The statutes providing the procedures for the imposition of the death penalty are not unconstitutional. *Gregg v. Georgia*, 428 U. S.

153 (96 SC 2909, 49 LE2d 859) (1976); *Braley*, 276 Ga. at 56 (43). This Court's proportionality review is neither inadequate nor unconstitutional. *Braley*, supra. See also *Morrison v. State*, 276 Ga. 829 (7) (583 SE2d 873) (2003); *Gissendaner*, supra at 716 (16).

9. Riley claims that the trial court erred by permitting the introduction of evidence in the guilt-innocence phase about his financial difficulties, marital problems, and treatment of his children. Evidence of a defendant's bad character is generally inadmissible in the guilt-innocence phase. See OCGA §§ 24-2-2; 24-9-20 (b). However, " ' "[e]vidence that is otherwise relevant and material to the issues in a criminal case does not become inadmissible simply because it incidentally puts a defendant's character or reputation into evidence." ' [Cits.]" *Mize v. State*, 269 Ga. 646, 650 (3) (501 SE2d 219) (1998). See also *Earnest*, 262 Ga. at 495 (1) (evidence of defendant's involvement in satanic cult admissible to show motive). Evidence of Riley's financial problems and money mismanagement was admissible to show his alleged financial motive for the murders. See id. Evidence about his marital problems and romantic relationships was admissible to show that he viewed the children as a source of friction between himself and Jacque and to establish how his wife and previous live-in girlfriend were able to see his relationship with Jacque, hear Riley's threats towards his children, and see how he treated them. Additionally, Riley did not object to any testimony about his previous living arrangements with his wife and girlfriend, so this contention is waived on appeal. See *Earnest*, supra. Testimony as to prior difficulties between Riley and his children, such as threats to kill them made to other people and his indifference to their welfare, is admissible to show motive and intent. See *Wall v. State*, 269 Ga. 506, 509 (2) (500 SE2d 904) (1998). The trial court did not err by admitting this evidence.

10. The trial court did not err by permitting neighbors and firefighters to testify about Riley's lack of emotion and cold demeanor during and after the fire that killed his children. See *Mullinax v. State*, 273 Ga. 756 (3) (545 SE2d 891) (2001); *Bagwell v. State*, 270 Ga. 175, 178-179 (1) (c) (508 SE2d 385) (1998).

11. The trial court ordered a change of venue for Riley's trial whereby jurors from Walton County would be selected for the Newton County trial. OCGA § 17-7-150 (a) (3). Riley alleges that venue should have been changed again because some of the prospective Walton County jurors had heard about the case, but this allegation is without merit due to the relatively few prospective jurors who had heard about the case and the fact that only eight out of ninety-three prospective jurors were excused for fixed opinions resulting from pretrial publicity. See *King v. State*, 273 Ga. 258 (4) (539 SE2d 783) (2000); *Tharpe v. State*, 262 Ga. 110 (5) (416 SE2d 78) (1992). Also, the

slight racial disparity between the Walton County and Newton County jury pools did not justify another change of venue. See *Terrell,* 276 Ga. at 44 (7).

12. Riley submitted written requests for jury charges on involuntary manslaughter and reckless conduct. The trial court refused to give these charges and Riley alleges this refusal as error. A written request to charge a lesser-included offense must be given if there is any evidence that the defendant is guilty of the lesser-included offense. See *State v. Alvarado,* 260 Ga. 563, 564 (397 SE2d 550) (1990). However, neither requested charge was authorized by the evidence. Involuntary manslaughter occurs when the defendant "causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." OCGA § 16-5-3 (a). Arson is a felony, so involuntary manslaughter would not apply. See *Brooks v. State,* 262 Ga. 187 (3) (415 SE2d 903) (1992); OCGA § 16-7-60 (a) (5). Riley confessed to intentionally setting his son's bed on fire, with his five-year-old son asleep in it, and his assertion during his statement that he intended to return a few minutes later to put the fire out does not authorize an involuntary manslaughter charge. See *Moody v. State,* 244 Ga. 247 (1) (260 SE2d 11) (1979).[5] For similar reasons, a jury charge on reckless conduct was also not required by the evidence. See *Waugh v. State,* 263 Ga. 692 (5) (437 SE2d 297) (1993).

13. The victim-impact testimony given by the victims' maternal grandparents was not improper. See *Lawler,* 276 Ga. at 232 (3); *Braley,* 276 Ga. at 54 (33).

14. Riley argues that the evidence was insufficient for the jury to find the statutory aggravating circumstance that the murder of Samantha Riley was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. OCGA § 17-10-30 (b) (7). Riley claims that the evidence of Samantha's death does not meet the definition of "depravity of mind." See *Phillips v. State,* 250 Ga. 336 (6) (c) (297 SE2d 217) (1982); *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980). The trial court refused to allow this statutory aggravating circumstance to be considered by the jury with regard to the other children, but allowed it to go to the jury as pertinent for Samantha's murder because the evidence, particularly Riley's statement, showed that she was alive during the fire, trapped behind the flames set by Riley, and screaming for Riley to help her. Based on the low carbon monoxide levels in the victims' blood, the medical examiner concluded that the children were alive and conscious when engulfed by the flames. "Depravity of mind may be found where the

---

[5] Riley did not testify.

victim is subjected to serious psychological abuse before death, or to mutilation, serious disfigurement, or sexual abuse after death." *Phillips*, supra at 340. The mere apprehension of death, immediately before the fatal wounds are inflicted by the defendant, does not constitute the psychological abuse sufficient to show depravity of mind. Id. at 341. However, the "[a]ge and physical characteristics of the victim may also support a finding of depravity of mind. [Cit.] We have upheld a finding of § (b) (7) where the victim was very old or very young." Id. at 340, n. 3. See *Rhode*, 274 Ga. at 384-385 (16) (a finding of depravity of mind supported by evidence of aiding and abetting the prolonged murder of an 11-year-old child); *McMichen v. State*, 265 Ga. 598 (2) (458 SE2d 833) (1995) (depravity of mind shown by infliction of mental distress on five-year-old girl who defendant left near her murdered mother's body); *Thomas v. State*, 247 Ga. 233 (275 SE2d 318) (1981). Considering the foregoing cases, we conclude that the trial court did not err by deciding that there existed sufficient evidence for the jury to find "depravity of mind" in the arson-murder of a conscious three-year-old child. See id.

15. Execution by lethal injection is not unconstitutional. See *Dawson v. State*, 274 Ga. 327, 334-335 (554 SE2d 137) (2001).

16. In the penalty phase, the trial court did not err by allowing the State to present a 1999 letter from Riley to his wife demanding that she engage in three-way sex with him and another woman. See *Whatley v. State*, 270 Ga. 296, 300 (11) (509 SE2d 45) (1998) ("All aspects of a defendant's crime, character, and attitude . . . [are] admissible in the sentencing phase."); *McMichen*, 265 Ga. at 607 (12); *Fugitt v. State*, 256 Ga. 292, 296 (1) (d) (348 SE2d 451) (1986) ("[A] defendant's character in general . . . [is] relevant to the question of sentence.").

17. The death sentences in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). Riley's death sentences are also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). Riley burned his three young children to death. The cases listed in the Appendix support the imposition of the death penalty in this case as they all involve multiple murders, the murder of children, or the § (b) (7) statutory aggravating circumstance.

*Judgments affirmed. All the Justices concur.*

APPENDIX.

*Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Raheem v. State*, 275 Ga. 87 (560 SE2d 680) (2002); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440)

(2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Rivers v. State*, 250 Ga. 303 (298 SE2d 1) (1982); *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981).

DECIDED OCTOBER 25, 2004 —
RECONSIDERATION DENIED NOVEMBER 22, 2004.

*John T. Strauss*, for appellant.
*W. Kendall Wynne, Jr.*, District Attorney, *Thurbert E. Baker*, Attorney General, *Mitchell P. Watkins*, Assistant Attorney General, for appellee.