## S07A1061. LYONS v. THE STATE.
(652 SE2d 525)

HINES, Justice.

Shirley Lyons appeals her convictions for malice murder, armed robbery, and kidnapping with bodily injury in connection with the asphyxiation death of her former boyfriend, Bobby Jackson. She

---

challenges the sufficiency of the evidence of her guilt; the affidavit in support of the search warrant for her home; the admission of autopsy photographs; the admission of statements by the victim; the admission of what she terms her "confession"; the exclusion of certain alleged expert testimony; the allowance of victim impact statements during the penalty phase; the denial of a mistrial; and the refusal to give certain requests to charge to the jury. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that Bobby Jackson was romantically involved with Jessica Smith. Shirley Lyons, Jackson's ex-girlfriend, began harassing Smith at Smith's office, prompting Smith to tell Jackson to "deal with his past." At approximately 6:45 p.m. on April 12, 2002, Jackson told Smith that he was going to Lyons's house to pick up some of his belongings. Later that evening, Jackson's body was found in the woods near a church playground. There was an impression on the embankment from the church parking lot that indicated that someone had slid or stumbled down the embankment. Jackson's body was wrapped in a quilt. Duct tape was wound very tightly around Jackson's entire face and head; one ear canal was the only exposed portion. His hands were bound behind him with duct tape, his feet were duct taped together, and his ankles were tied to his neck with a white cloth. There were dead leaves and dirt on his clothing.

An autopsy on Jackson's body revealed cuts and abrasions on his head and face, indicating blows to the head, a small stab wound to the neck, discoloration around the neck, hemorrhaging indicating strangulation, a broken bone in his neck, a fractured vertebrae, and blood in the lungs. The cause of death was ligature strangulation with upper airway obstruction.

On April 15, 2002, a homicide detective investigating Jackson's death had a telephone conversation with Lyons. Lyons related that

---

[1] The crimes occurred on April 12, 2002. On April 22, 2003, a Pike County grand jury indicted Lyons for the malice murder of Jackson; the felony murder of Jackson while in the commission of aggravated assault with intent to rob; the armed robbery of Jackson in taking his jewelry and wallet; the armed robbery of Jackson in taking his vehicle; and the kidnapping with bodily injury of Jackson. On May 8, 2003, the State gave notice of its intent to seek the death penalty based upon 21 statutory aggravating circumstances. Lyons was tried before a jury February 9-11, 2004, and found guilty of all charges. In the penalty phase, the jury found beyond a reasonable doubt the existence of five aggravating circumstances and fixed Lyons's punishment at life imprisonment without parole. On February 12, 2004, Lyons was sentenced to life in prison without the possibility of parole for malice murder; a consecutive term of life in prison for armed robbery (the court found that the two armed robbery counts merged for the purpose of sentencing); and a term of life in prison for the kidnapping charge, to be served concurrently with the life term for armed robbery. The felony murder stood vacated by operation of law. A motion for new trial was filed on February 18, 2004, and amended and denied on March 22, 2007. A notice of appeal was filed on March 22, 2007, and the case was docketed in this Court on April 3, 2007. The appeal was submitted for decision on May 28, 2007.

Jackson came to her house on April 12 to give her money to pay a utility bill and that the last time she saw him was at 7:00 that evening when he left to go to a meeting. After speaking with Smith and Jackson's daughter regarding the time that Jackson was at Smith's home on April 12, the detective became suspicious about the time frame related by Lyons, so he visited Lyons at her home on April 23, 2002. Lyons told the detective about jewelry she had given Jackson, and the detective realized that even though Jackson's body was found adorned with jewelry, the pieces described by Lyons were not on the body. The detective noticed that Lyons had new bed sheets and a new quilt; he also noticed curtains whose pattern appeared to match that of the quilt on Jackson's body. The detective picked up Lyons from her office and took her to the police station on April 29 where she gave a statement, which was typed up and then signed by Lyons; the detective returned her to work after the statement. In this statement, Lyons related that Jackson came to her home around 6:15 p.m. on April 12 to bring her money to pay the light bill; they discovered the lights were out and he left to get some electric cords; he came back and connected the cords; Jackson left to go to a meeting at 6:45 p.m. or 6:50 p.m., but he did not disclose its location; and when Jackson left he was wearing the jewelry Lyons had given him.

The following day, the detective obtained a search warrant for Lyons's home and the nearby trailer which she also used. The home search revealed bloodstains on the floor and wall, and curtains that matched the pattern of the quilt wrapped around Jackson's body. Analysis determined that one of the bloodstains was from Jackson. After the detective apprised Lyons that they had found evidence that the murder was committed in her home, Lyons put her head down, cried, and stated, "I didn't mean for him to die, I just meant for them to hurt him." The detective read Lyons her *Miranda*[2] rights. But, Lyons chose to speak with the detective and told him that she had paid two guys to beat up Jackson, but that it got out of control. She indicated that Jackson had been taped up in the bedroom, where the murder occurred. Lyons was taken to the police station, where she was again advised of her *Miranda* rights. She then gave a two-part videotaped statement, and confessed to assisting in Jackson's murder. She stated that she hired a person to kill Jackson.

Lyons identified Khalique Shariff as the person she hired. Following Shariff's arrest, Shariff admitted to killing Jackson because Lyons hired him to do so. Shariff described how the murder occurred.

Shariff testified at trial that initially Lyons had asked him to hurt Jackson, but eventually she hired him to kill Jackson. Lyons was

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

going to pay Shariff $2,000 for the murder. Lyons picked up Shariff at about 3:00 p.m. on April 12, 2002. They then purchased beer, duct tape, and gloves, and went to Lyons's house to wait for Jackson. Lyons heard Jackson arriving and gave Shariff a silver .38 caliber revolver and told him to wait in the closet; Shariff did so. Shariff heard Lyons and Jackson arguing about the light bill and Jackson gave Lyons $50 for the bill. Jackson then left to get an extension cord, and Shariff and Lyons tried to devise a plan for the murder. Shariff advised that they latch the door to prevent Jackson from escaping when Shariff appeared. When Jackson returned, Shariff emerged from the closet with the pistol drawn and ordered Jackson to "lay it down." Jackson hesitated, but after Lyons also ordered him to lie down, Jackson "got on the ground." Shariff passed the pistol to Lyons, while he ripped sheets to bind Jackson. Lyons screamed at Jackson, and Shariff went outside. Lyons summoned Shariff back inside, telling him that Jackson was struggling and attempting to get loose. Lyons asked Shariff to kill Jackson. Shariff covered Jackson's head and face with duct tape and stabbed him in the neck. Lyons kicked Jackson in the side. They took the blanket off the bed and wrapped it around Jackson. They took Jackson's wallet and jewelry, and then placed him in the hatchback of his own car. Shariff dumped Jackson down a ravine by a church playground, abandoned the car, and threw the pistol away. Lyons had given Shariff the $50 she had received from Jackson; Lyons later paid Shariff an additional $150.

1. Lyons contends that the State failed to prove beyond a reasonable doubt her guilt of the offenses with which she was charged, and therefore, she was entitled to a directed verdict of acquittal on all counts. She argues that particularly her conviction for kidnapping with bodily injury cannot stand because the State failed to establish asportation of the victim. But, that is not the case.

The requirement of asportation to prove kidnapping is satisfied if there is movement of the victim, however slight that movement is. *Griffin v. State*, 282 Ga. 215 (647 SE2d 36) (2007). The distance that a kidnapper transports the victim is not of legal significance. *Mullins v. State*, 280 Ga. App. 689 (634 SE2d 850) (2006). However, where the movement involved is minimal, and the alleged kidnapping occurs in furtherance of some other criminal enterprise, in order to constitute "asportation" the movement must be more than a mere positional change of the victim incidental to the other criminal act; it must be movement, even if a positional change, designed to better carry out the criminal activity. *Garza v. State*, 285 Ga. App. 902, 903-904 (1) (a) (648 SE2d 84) (2007); *Leppla v. State*, 277 Ga. App. 804, 807 (1) (627 SE2d 794) (2006). That is precisely the situation in this case. Here, even assuming that Jackson was dead by the time he was moved to his car, the evidence was that Lyons and Shariff forced Jackson at

gunpoint to go from a standing position to lying on the floor. And it is clear that this positional change was more than the result of the aggravated assault; it materially facilitated what followed, that is, the intentional suffocation of Jackson as well as his armed robbery.[3] Consequently, the jury was authorized to find there was asportation of Jackson to support the charge of kidnapping with bodily injury. *Garza*, supra at 904 (1). Lyons was not entitled to directed verdicts on any of the charges. Indeed, the evidence was sufficient to enable a rational trier of fact to find Lyons guilty beyond a reasonable doubt of the crimes with which she was charged and convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Lyons contends that the trial court improperly admitted evidence gathered during the search of her home because the affidavit submitted in support of the search warrant did not demonstrate probable cause for its issuance. But, that is not the case.

> The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Our duty in reviewing the magistrate's decision . . . is to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search [warrant]. A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court. The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men . . . act. Moreover, even doubtful cases should be resolved in favor of upholding a warrant.

(Citations and punctuation omitted.) *State v. Hunter*, 282 Ga. 278 (646 SE2d 465) (2007).

The affidavit stated, inter alia, that the affiant detective was an experienced homicide investigator and that his investigation of Jackson's homicide disclosed that Jackson's estranged girlfriend, Lyons, was the last person to see Jackson alive; that the time frame Lyons

---

[3] A defendant may commit an armed robbery even if he kills the victim first and then takes the victim's property. *Cross v. State*, 271 Ga. 427, 429 (1) (520 SE2d 457) (1999).

had related for Jackson being at her home was inconsistent with evidence placing Jackson there later in the evening and closer in time to the discovery of his body; that the amount of Jackson's blood found in the hatchback of Jackson's abandoned vehicle indicated that he had been transported in the hatchback; that certain items of Jackson's had been in the hatchback when he left to go to Lyons's home; that the items were taken out of the hatchback before Jackson was placed inside; that Jackson was scheduled to work the afternoon following his disappearance and that Jackson would have needed certain of these items for work, including his work uniform and work identification card; following his death, Lyons gave the items to Jackson's family; Jackson had specific jewelry on his person when he left to see Lyons, and when his body was found some of that jewelry was missing; and the missing jewelry had been given to Jackson by Lyons.

On its face, the affidavit provided the magistrate with enough information to reach the practical, common-sense conclusion that there was a fair probability that evidence of a crime could be found at Lyons's residence. Id.

3. Lyons next contends that the trial court improperly admitted into evidence two post-incision autopsy photographs, State's Exhibits Nos. 169 and 179, because they were more prejudicial than probative, serving only to inflame the jury. But, the contention is unavailing.

Post-incision autopsy photographs are admissible if they show some material fact that becomes apparent only due to the autopsy. *Banks v. State*, 281 Ga. 678, 680-681 (2) (642 SE2d 679) (2007). The forensic pathologist testified that Exhibit No. 169 showed a hemorrhage and broken neck that could not otherwise be seen. As to Exhibit No. 179, the forensic pathologist stated that it depicted a carotid artery and a crossing bone fracture not recognizable or seen without opening the wound. Thus, these internal injuries could not have been shown by photographs of the outside of the body. Id. Lyons complains that the injuries in question were not the subject of the indictment or the cause of death. However, while the depicted injuries may not have been the direct cause of the victim's death, they were material in corroborating the details of the assault on the victim which ultimately led to his demise. The trial court did not abuse its discretion in admitting the photographs. *Peterson v. State*, 274 Ga. 165, 171 (5) (549 SE2d 387) (2001).

4. Lyons maintains that the trial court improperly admitted hearsay when it allowed Smith to testify about certain statements

that Jackson made to her.[4] Failing to cite any legal authority, she argues merely that the statements were not admissible under any hearsay exception.

The trial court found that the declarant was the deceased victim, and therefore, unavailable, and allowed the testimony implicitly under the necessity exception to hearsay.[5] See OCGA § 24-3-1 (b).[6] A hearsay statement is admissible under this exception when it is necessary and accompanied by particularized guarantees of trustworthiness. *Turner v. State*, 281 Ga. 647, 649-650 (3) (a) (641 SE2d 527) (2007). Such necessity may be shown when the declarant is deceased and the statement is relevant to a material fact and is more probative of the material fact than other evidence that may be produced and offered; the trustworthiness requirement is satisfied when the declaration is coupled with circumstances which attribute verity to it. Id. The trial court's determination of the issue will not be disturbed absent an abuse of discretion. Id.

Lyons argues neither the "necessity" element nor the "particularized guarantees of trustworthiness" element of admissibility under the necessity exception. See *Culmer v. State*, 282 Ga. 330 (647 SE2d 30) (2007). However, it appears that such elements were satisfied. The declarant, Jackson, was unavailable due to his murder. The statements were relevant to Lyons's relationship with Jackson, her motive, her pattern of conduct, and her opportunity to commit the crimes. Finally, the statements had particular guarantees of trustworthiness because of the close relationship between Jackson and Smith. *Brooks v. State*, 281 Ga. 514, 518 (3) (640 SE2d 280) (2007). The evidence was that the two were involved in a romantic relationship and were living together.

Even assuming arguendo that the statements were inadmissible hearsay, allowing the testimony does not constitute reversible error unless Lyons suffered harm. *Heard v. State*, 274 Ga. 196, 199 (6) (552 SE2d 818) (2001). In light of the overwhelming evidence of Lyons's involvement in the crimes, including Shariff's admissions and her own inculpatory statements, it is highly probable that the admission

---

[4] Lyons cites the following statements to the effect that: Lyons was a "nut"; Smith should keep Lyons out of her office; Jackson described the relationship with Lyons; Jackson said he loved Smith and that it was "over" with Lyons; Jackson told Smith to keep her door locked; Jackson was now popular with women because he worked for MARTA; Jackson wanted Smith to bring his work clothes to a meeting; and Jackson told Smith he was going to Lyons's home because he was tired of Lyons constantly calling him on his cell phone and he was going to pick up his clothes.

[5] Lyons makes no suggestion of a violation under *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004).

[6] OCGA § 24-3-1 (b) states:
Hearsay evidence is admitted only in specified cases from necessity.

of the contested testimony did not contribute to the verdicts; therefore, any error in admitting the statements was not harmful. Id.

5. Lyons asserts that the trial court improperly excluded testimony from her proffered expert witness in the area of police interrogation tactics resulting in false confessions.

Lyons sought to have Dr. Richard Ofshe testify as an expert witness on false confession theory. Following a hearing outside the jury's presence at which Ofshe testified, the trial court ruled that it would not allow the testimony based upon the evidence in the case, because such theory had not reached a verifiable stage of scientific certainty, and because whether Lyons's inculpatory statements were the results of threats or coercion was a matter the jury could discern for itself.[7]

In *Riley v. State*, 278 Ga. 677, 682 (4) (604 SE2d 488) (2004), this Court noted, "the knowledge that a false confession can be obtained from a suspect by police is not beyond the ken of the average juror; this knowledge is implicit in the jury charges on the voluntariness, credibility, and corroboration of a defendant's statement to the police." This Court further observed in *Riley* that the admission of expert testimony based on the theory of false confessions was premature and unreliable inasmuch as there was insufficient scientific support and too many unanswered questions regarding such theory. Id. at 682-683 (4). In short, false confession theory does not satisfy the evidentiary test in criminal cases set forth in *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982).[8]

Moreover, on the issue of whether certain police interview techniques may result in a greater likelihood of false confessions by the person being interrogated, Ofshe was questioned at length in this regard before the trial court, and he testified about other cases with which he had been involved; but, when asked what he had to impart specifically about Lyons's case that would help the jury's understanding, Ofshe responded that he would explain generally how interrogation works.[9]

---

[7] Apparently, Lyons told Ofshe that at one point the detective threatened her with a gun and then later made her an offer of leniency.

[8] Lyons does not address the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993), regarding the admissibility of scientific evidence. In any event, this Court has recently affirmed Georgia's traditional reliance on *Harper* in criminal matters. *Vaughn v. State*, 282 Ga. 99, 101 (3) (646 SE2d 212) (2007).

[9] The following colloquy occurred:
STATE: What's your expected testimony in—Let's talk about this case; let's not talk about Illinois, Temple murders in Phoenix, or anything else. What have you got to say about this particular case that would help this jury understand something about it?

The decision whether to admit Ofshe's testimony was within the sound discretion of the trial court, whose determination will not be disturbed absent a clear abuse of discretion. *Riley v. State*, supra at 683 (4). Under these circumstances, the trial court did not abuse its discretion by refusing to allow the testimony on false confession theory. Id.

6. Lyons further asserts that the trial court improperly admitted her "confession"[10] because it was coerced in light of the totality of the evidence that was available to the trial court. She fails to cite any legal authority in support of her assertion of the involuntariness of her "confession," but instead, urges that the issue of voluntariness should be considered along with her challenge to the exclusion of evidence by Dr. Ofshe on false confession theory, that is, that this Court should examine Dr. Ofshe's testimony in determining whether her "confession" was coerced. See Division 5, supra. But, as this Court has explained, the testimony on false confession theory was properly disallowed. See Division 5, supra. Therefore, this Court will not grant Lyons's request to review the decision below by considering evidence not admissible before the trial court.[11]

This Court is to accept a trial court's factual and credibility findings as to the voluntariness of custodial statements unless they are clearly erroneous, and in this case, there is evidence to support the trial court's determination that Lyons's inculpatory statements were voluntarily made. *Young v. State*, 280 Ga. 65, 67 (3) (623 SE2d 491) (2005).

7. Lyons is unsuccessful in her bare assertion[12] that it was error to allow victim impact statements during the penalty phase of her trial because such statements are per se violative of the State and Federal Constitutions. "Victim impact evidence is not unconstitutional in the sentencing phase in general." *Braley v. State*, 276 Ga. 47, 54 (33) (572 SE2d 583) (2002).

8. There is likewise no merit to Lyons's contention that the trial court improperly overruled her motion for mistrial and its renewal as well as erroneously denying her request to instruct the jury relative to the motion.

---

OFSHE: Generally how interrogation works in order to create a frame work in order to understand the fact testimony given by people who are present at the interrogation.

[10] Lyons fails to specify which of her inculpatory statements she deems to be her "confession"; however, her inculpatory statements to police, collectively, will be considered in this enumeration.

[11] In argument, Lyons also mentions that the trial court refused to allow a psychologist who examined her to view the videotape of her "confession" "while it was played" ostensibly for the jury, but this is not enumerated as error or pursued by legal argument or citation of authority.

[12] Here again, Lyons fails to support her argument with legal authority.

During the cross-examination of Lyons's mitigation witnesses, the State asked questions about Lyons's prior convictions. At the charge conference following the testimony, Lyons, citing *Ring v. Arizona*, 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002) and *Apprendi v. New Jersey*, 530 U. S. 466 (120 SC 2348, 147 LE2d 435) (2000), moved for a mistrial because the State had not tendered certified copies of the convictions. The State responded that it had certified copies of the convictions, but that it was unable to obtain transcripts of the guilty pleas from the clerk of court. The State also maintained that it had a good faith basis for the cross-examination. The certified copies of the convictions and the corresponding indictments were made State's exhibits in the case. The trial court overruled the motion for mistrial, explaining that the State was not introducing the convictions into evidence in aggravation, but rather to merely cross-examine the witnesses about the basis of their testimony. The trial court also denied Lyons's request to instruct the jury to disregard the testimony about the convictions, and her renewal of her motion for mistrial.

First, Lyons did not object to the cross-examination as it was taking place. Thus, Lyons failed to make the required contemporaneous objection in order to preserve her complaint for review on appeal. *Butler v. State*, 273 Ga. 380, 382 (5) (541 SE2d 653) (2001). In any event, neither a mistrial nor curative instruction was warranted inasmuch as the documentary evidence of the convictions and indictments placed in the record were in order for the State to demonstrate it had a good faith basis for asking Lyons's mitigation witnesses on cross-examination about their knowledge of Lyons's criminal history, and such documents were sufficient to establish that the State had a good faith basis for its cross-examination questions regarding Lyons's convictions. *Presnell v. State*, 274 Ga. 246, 253 (13) (a) (551 SE2d 723) (2001).

9. Finally, Lyons makes the blanket complaint that the trial court failed to give her requests to charge for the penalty phase "even though they were a correct statement of the law and conformed to the evidence." Even assuming that the requested charges accurately stated the law and were adjusted to the facts, it was not necessary for the trial court to give the exact language of the requests by Lyons inasmuch as its instruction to the jury fairly covered the legal principles applicable in the penalty phase of the case. *McCoy v. State*, 273 Ga. 568, 573 (12) (544 SE2d 709) (2001).

*Judgments affirmed. All the Justices concur, except Hunstein, P. J., who concurs in judgment only as to Division 1.*

DECIDED OCTOBER 29, 2007.

*John A. Beall IV*, for appellant.
*Scott L. Ballard, District Attorney, Thurbert E. Baker, Attorney General, David A. Zisook, Assistant Attorney General*, for appellee.