FINAL COPY
294 Ga. 624

S13A1564.  WOODALL v. THE STATE.

BENHAM, Justice.

Appellant Lecester "Buddy" Woodall, Jr., was convicted of felony murder and armed robbery in connection with the September 4, 2000, shooting deaths of his uncle John Lavelle Lynn and his uncle's employee Robert Van Allen.[1] The evidence in a light most favorable to the jury's verdict showed that the day before the murders, appellant enlisted the assistance of his brother-in-law, co-defendant David Wimberly, in the armed robbery of Mr. Lynn who owned a wrecker for towing cars in his used auto business and who was known to carry a lot of cash.[2] Mr. Lynn's daughter testified that on the morning of the murders

---

[1] The crimes occurred on September 4, 2000.  On March 28, 2001, a Glynn County grand jury indicted appellant and David Wimberly on two charges of malice murder and on one charge of armed robbery as to John Lavelle Lynn.  The State sought the death penalty, and appellant was tried separately before a jury from August 11, 2005, to September 9, 2005.  The jury found appellant guilty of two lesser charges of felony murder and the count of armed robbery.  At the sentencing phase, the jury declined to impose the death penalty, and appellant was sentenced to three consecutive life sentences for the two counts of felony murder and the count of armed robbery. Appellant moved for a new trial on September 20, 2005, and amended the motion on August 29, 2011.  The trial court denied the motion for new trial, as amended, on March 7, 2012.  Appellant filed a timely notice of appeal on March 28, 2012, and the case was docketed to the September 2013 term of this Court.  The case was orally argued on October 8, 2013.

[2] Evidence at trial showed appellant also attempted to enlist the assistance of another man in the armed robbery, but that man declined.

a man called and talked to Mr. Lynn, requesting a tow for a vehicle that was on Bladen Road by the railroad tracks. Prior to leaving to meet the caller, Mr. Lynn counted out $490 in cash for some bills he intended to pay that day, put the money in his wallet, and placed the wallet in the back pocket of his pants. He and Mr. Van Allen left the house. When the victims arrived at the Bladen Road location, which was in Glynn County and surrounded by a wooded area, appellant and his co-defendant ambushed and shot them. A man hunting in the area heard three to four gunshots and shortly thereafter discovered the victims' bodies next to the wrecker which still had the engine running. The man immediately called police. A father and son who had been riding all-terrain vehicles down Bladen Road earlier that day, saw a wrecker turn onto Bladen Road. A few minutes later, the father and son saw the wrecker parked near the place where Bladen Road traversed some railroad tracks, and they saw two men, one standing near the wrecker and the other standing near a light blue or white car. The father and son testified that the car was positioned behind the wrecker and facing in the same direction as the wrecker as if it was about to be loaded and towed. The father testified that he also saw a pair of shoes lying in the grass near the man standing by the wrecker. The father and son rode past the

2

wrecker and the men "a short ways," but, because he had a feeling that something "was wrong," the father decided to turn back around. At that point, the father and son saw the car, which they had assumed was broken down, suddenly pull out and drive away from the wrecker at a high rate of speed. As they headed back home, the son testified that he thought he saw someone lying behind the wrecker by the railroad tracks.

The police collected physical evidence which revealed Mr. Van Allen was shot three times with a .25 Lorcin pistol. The evidence also showed that a pearl-handled .25 Lorcin pistol and two other guns had been stolen from appellant's father's safe in May 2000. An acquaintance of appellant testified that sometime before the murders, he saw appellant with a .25 pearl-handled pistol and a 9mm Ruger. The medical examiner testified two of the three gunshots were fatal as to Mr. Van Allen – one to his head and another that went through his chest piercing his lungs and heart. The gunshot to Mr. Van Allen's head was made from a distance of 16 to 18 inches because there was gunpowder residue at the site of the entrance wound. Mr. Lynn died due to a gunshot to the back of the head. Authorities were unable to recover the bullet or shell casing which would have revealed the caliber of the weapon used to inflict Mr. Lynn's injury. The

lead investigator on the case testified he had a discussion with the medical examiner wherein the medical examiner opined that Mr. Lynn was shot with a .38 caliber weapon; however, the medical examiner testified at trial that he could not determine what caliber weapon was used against Mr. Lynn. Still, police generally believed appellant and his co-defendant were both shooters, although appellant told police his co-defendant shot both victims. A forensic witness testified that the tire tracks located at the scene matched three of the four tires on appellant's light blue Pontiac 6000. The record also showed that when Mr. Lynn's body was discovered, his wallet was missing from his person;[3] but the wallet was recovered several months later, emptied of money and lying by the roadside in another county. The police traced the phone call requesting Mr. Lynn's wrecker services at Bladen Road to one of two pay phones located at a convenience store where appellant was captured on surveillance video the morning of the murders. Six months after the killings, appellant was questioned by police and ultimately confessed to his participation in the double homicide.

1. The evidence adduced at trial and summarized above was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable

---

[3] In contrast, the police found Mr. Van Allen's wallet on his person with money inside it.

doubt of the crimes for which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant alleges his constitutional rights were violated because he contends a juror was illegally seated. Cynthia L. Battle, an African-American woman born in 1954, served on appellant's jury. When she received her jury summons, it contained her correct address and the name "Cynthia R. Battle." Mrs. L. Battle did not think much of the name on the summons because her maiden name had been Rogers. When she arrived for jury service, she talked to a court employee about the name on her summons and was told that she was the correct person called for jury service. Mrs. L. Battle thus continued through the jury process and completed the juror questionnaire, including providing her correct vital statistics such as her date of birth. In addition to juror questionnaires, both parties had a copy of the master list of summoned jurors which listed Cynthia R. Battle as a Caucasian woman born in 1963. Over a period of two weeks, the parties conducted voir dire, and, while Mrs. L. Battle was subject to extensive questioning, neither party caught the discrepancy between the Cynthia Battle who was summoned and the Cynthia Battle who appeared for service. At the motion for new trial hearing, the clerk of court

5

produced the master traverse jury list which indicated that both Cynthia R. and Cynthia L. were qualified to sit on the jury. Nevertheless, appellant contends Mrs. L. Battle was illegally seated and that he is entitled to a new trial. We disagree. Since appellant had access to the juror list which revealed that Cynthia R. Battle was a Caucasian woman born in 1963, he could have discovered, with the exercise of ordinary diligence, that there was a discrepancy and a basis to object when Mrs. L. Battle, who is African-American and was born in 1954, appeared for service. Appellant's failure to object before a verdict was rendered constitutes a waiver of this issue on appeal. Allen v. State, 299 Ga. App. 201 (1) (a) (683 SE2d 343) (2009).

3. Appellant contends the trial court erred when it determined the State did not violate Batson v. Kentucky.[4]

> Batson provides a three-step process for adjudicating a claim that a peremptory challenge was based on race: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent. A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous.

---

[4] Batson v. Kentucky, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

Bester v. State, 294 Ga. 195, 198-199 (3) (751 SE2d 360) (2013) (citations and punctuation omitted). Because the State was seeking the death penalty in this case, attorneys asked prospective jurors during voir dire to rate themselves in regard to their feelings about the death penalty. At the conclusion of voir dire, appellant raised a violation of Batson based on race. The trial court determined a prima facie case had been made and the State was required to come forward with a nondiscriminatory rationale for its strikes. In regard to juror Linda Dallas, who was African-American, the State stated that it struck her because she said, "all life is precious," and because she rated herself a 3 on a scale of 1 to 10 where 1 was defined as being against the death penalty and 10 was defined as being in favor of the death penalty "for every murder." When questioned by the trial court, the prosecution affirmatively stated that no seated juror rated less than a 5 on the so-called "death penalty scale." When the Batson issue was first raised to the trial court, appellant identified one Caucasian female who allegedly rated less than a 5 and was not struck, but the trial court denied the Batson challenge, finding no discriminatory intent on the part of the State. At the motion for new trial stage of the case, appellant identified two Caucasian males — Jurors Thorton and Galyean — whom he argues rated under a 5, but were not

7

struck by the State. The record shows that during voir dire, Juror Thornton was initially asked how strongly he was in favor of the death penalty where 10 was the strongest and Juror Thorton rated himself a 3. The trial court made a point of clarification that the scale was how strongly the juror believed that the death penalty should be a sentencing option. At that point, Juror Thornton changed his rating to 10. Juror Galyean was selected to serve as an alternate, but never participated in deliberations or the verdict. During voir dire, he was asked to rate himself on a scale of 1 to 10 where 1 was defined as the death penalty being a necessary evil in society and 10 being defined as the strongest rating, i.e., that the death penalty is not used nearly enough. Juror Galyean rated himself a 2. In its order denying the motion for new trial, the trial court again denied appellant's Batson challenge, finding the State's rationale to be race-neutral.

Here, we cannot say that the trial court's decision was clearly erroneous. Unlike appellant alleges, the "death penalty scale" questions were not the same from juror to juror. And Juror Thornton changed his rating from 3 to 10 when the question was clarified for him. There is also no evidence that Jurors Thornton and Galyean made a statement to the effect that all life is precious as did Juror Dallas. Accordingly, we will not disturb the trial court's determination

8

that appellant failed to show the State had a discriminatory intent when it struck Juror Dallas.

4. Appellant argues the trial court erred when it failed to exclude his video-recorded statement to police because he contends his statement was involuntarily made and was induced by a hope of benefit in violation of former OCGA §§ 24-3-50 and 24-3-51.[5] "When a court considers whether a statement was voluntary, it must look to the totality of the circumstances. . . ." Edenfield v. State, 293 Ga. 370 (2) (744 SE2d 738) (2013). We review the law de novo, but defer to the trial court's findings of fact. Id. at 374. Appellant first complains that his intoxication and the length of the interrogation rendered his statement involuntary. Appellant alleges he was intoxicated, but the police testified that appellant was coherent and was appropriately responsive to the questions posed. While appellant's interrogation occurred over a period of approximately six hours from 9:00 p.m to after 3:00 a.m. the next morning, it was not continuous as it started at the Brantley County Sheriff's office, where

---

[5] These two provisions are now codified as OCGA §§ 24-8-824 and 24-8-825 as part of the new Georgia Evidence Code which took effect on January 1, 2013.

9

appellant received and waived his <u>Miranda</u>[6] rights, and continued at the Glynn County police office where appellant again received and waived his <u>Miranda</u> rights and agreed to submit to a voice stress test. Appellant drove himself to the Brantley County location, and then his father drove him to Glynn County. Appellant was unrestrained throughout, took smoking breaks, used the restroom unescorted, and was free to leave during the entire period of his questioning as he was not arrested until the very end after being confronted with the results of his voice stress test. In light of the circumstances, we find the trial court did not err in determining appellant's statement to be voluntary in spite of appellant's allegations that he was intoxicated and fatigued from a lengthy interrogation. See <u>McIlwain v. State</u>, 264 Ga. 382 (4) (445 SE2d 261) (1994).

Appellant also contends the police told him he could go home and he made incriminating statements as a result.[7]

---

[6] <u>Miranda v. Arizona</u>, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[7] Appellant admitted to being at the scene with his co-defendant, but denied that he shot anyone.

10

To be admissible, a confession must have been made voluntarily without being induced by the slightest hope of benefit or remotest fear of injury. [Cit.] A hope of benefit generally arises from "promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." [Cit.]

Dennis v. State, 293 Ga. 688 (2) (748 SE2d 390) (2013). While one of the officers interrogating appellant did tell him he could go home, such statements in context did not constitute a hope of benefit because no one promised appellant that he would not be charged with a crime or that he would receive reduced charges, sentencing or punishment if he made incriminating statements. See Brown v. State, 290 Ga. 865 (2) (b)-(c) (725 SE2d 320) (2012). Accordingly, the trial court did not err when it determined the statement was voluntary and allowed it to be admitted at trial.

5. Appellant contends the trial court erred when it denied his request to tender Dr. Richard Leo as an expert in police interrogation techniques and false confessions. This Court has upheld rulings within the last several years that this proposed area of expert testimony has not reached the "level of scientific reliability" necessary to allow its admission at trial. See Wright v. State, 285

11

Ga. 428 (1) (677 SE2d 82) (2009).  See also  Lyons v. State, 282 Ga. 588 (5)

(652 SE2d 525) (2007), overruled on different grounds by Garza v. State, 284

Ga. 696 (1) (670 SE2d 73) (2008); Riley v. State, 278 Ga. 677 (4) (604 SE2d

488) (2004). Having reviewed the hearing transcript on the expert's proffer[8] in

this case, we conclude the trial court did not abuse its discretion when it barred

the expert from testifying in this case.

6.    At trial, appellant strenuously objected to testimony from four

witnesses concerning a conversation that allegedly occurred the day before the

murders.  The record shows the State called Jeffrey Wimberly, who was the co-

defendant's brother and appellant's brother-in-law, to testify at trial.  During the

State's direct examination, Wimberly stated he had never heard anyone talking

about robbing Mr. Lynn prior to the murders.   The State then provided

Wimberly with the written statement he gave to police a few days after

---

[8] Dr. Leo, who is a social psychologist and criminologist, stated that he wrote his doctoral thesis on false confessions and he indicated that he had personally viewed two to three hundred videotaped confessions since 1994.  He stated, however, that there is no database of false confessions and each researcher is limited by his own collection of data.  He also testified that not every jurisdiction is required to videotape interrogations and so any data is also limited in that respect. Dr. Leo said he reviewed the videotape of appellant's confession, but was not asked to determine whether appellant's confession was true or false.  He also admitted he could not opine to the jury as to whether any particular interrogation resulted in a false confession, stating that the most he could do for the jury was identify the police interrogation techniques being utilized in the video.

12

appellant's arrest. Wimberly admitted the written statement was his and confirmed that in his statement he mentioned a conversation he had with appellant and the co-defendant in which they asked him to come along to rob Mr. Lynn, but that he declined their request. On cross-examination, Wimberly stated he made his written statement to police under the threat of having his probation revoked for failing a drug test. Officer Scott Trautz testified about the interview he had with Wimberly during the investigation of the murders. Officer Trautz stated that Wimberly provided authorities with a written statement confirming his verbal statement to them that the defendants had approached Wimberly and asked him to participate in robbing Mr. Lynn and, in response, Wimberly said, "Hell no. I just got out of jail."

During his testimony, Wimberly also denied telling his friend Allen Ray Mercer about the conversation he had with the defendants. The State then called Mercer, and he admitted he gave a written statement to Officer Thomas Tindale, but could not say what he told police. The trial court instructed the jury that Mercer's testimony was solely for the purpose of impeaching Wimberly's testimony. Officer Tindale then testified that Mercer verbally stated to him that Wimberly told Mercer about a conversation Wimberly had with the defendants

13

a day before the murders during which they discussed robbing Mr. Lynn. Officer Tindale stated that Mercer's verbal statement to him was consistent with the handwritten statement Mercer provided to police. The trial court instructed the jury that Officer Tindale's testimony was for the limited purpose of impeachment.

Throughout the testimony of Wimberly, Mercer, Officer Trautz, and Officer Tindale, appellant objected that there was a Confrontation Clause issue and that the testimony constituted hearsay. The State countered it was entitled to introduce evidence of Wimberly's and Mercer's prior inconsistent statements for the purpose of impeachment as well as for the purpose of providing substantive proof. Ultimately, the trial court allowed in the testimony as described above subject to the limiting instructions indicated. On appeal, appellant argues that the testimony of Mercer and Tindale was inadmissible hearsay and that the trial court erred by allowing the jury to treat it as substantive evidence of the conversation between Wimberly and the defendants.[9]

---

[9] Appellant apparently has abandoned any challenge to the testimony of Wimberly and Officer Trautz and so we will not address it.

Appellant's arguments lack merit. The record shows that the trial court specifically instructed the jury that the testimony of Mercer and Officer Tindale was to be considered only for the purpose of impeachment. In Georgia, prior inconsistent statements may be admitted for the purpose of impeachment. See former OCGA § 24-9-83 ("A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case.").[10] See also Holiday v. State, 272 Ga. 779, 781 (2) (534 SE2d 411) (2000) (prior inconsistent statements were admissible for impeachment purposes and as substantive evidence where witnesses denied or could not remember specific details of their statements). Even if the jury ignored the trial court's specific instruction and treated the testimony of Mercer and Officer Tindale as substantive evidence, that too was permissible under Georgia law since the witnesses were available at trial and subject to cross-examination. Id. at 780. Therefore, appellant has failed to show reversible error on these grounds.

7. Upon conducting a pretrial hearing, the trial court allowed the admission of evidence showing that the home of appellant's parents was

_____

[10] OCGA § 24-9-83 was repealed effective January 1, 2013. The use of prior inconsistent statements for the purpose of impeachment is now codified at OCGA § 24-6-613 (b).

burglarized a few months before the murders and that the items stolen included a pearl-handled, .25 Lorcin pistol. Since appellant had not been named a suspect, charged with, or convicted of the burglary, the trial court instructed the State it could not refer to appellant as being a suspect in the burglary. With such limitation, appellant's father testified at trial about the burglary as did the investigating officer. Appellant contends this evidence constituted improper bad act evidence impinging on his character. We disagree. "Any evidence is relevant which logically tends to prove or to disprove a material fact which is at issue in the case, and every act or circumstance serving to elucidate or to throw light upon a material issue or issues is relevant. [Cit.]" Crozier v. State, 263 Ga. 866 (2) (440 SE2d 635) (1994). The fact that relevant evidence may incidentally place the defendant's character in issue does not automatically render the evidence inadmissible. Lewis v. State, 293 Ga. 110 (2) (a) (744 SE2d 21) (2013). The trial court's decision regarding the admissibility of evidence will not be disturbed absent a showing of an abuse of discretion. Burgess v. State, 292 Ga. 821 (4) (742 SE2d 464) (2013). In this case, the ballistics expert testified that projectiles taken from Mr. Van Allen's body were consistent with being shot from a .25 Lorcin pistol. Another witness testified to seeing

16

appellant with a pearl-handled gun sometime before the murders. Thus, evidence of the burglary was admissible to show appellant had access to a weapon similar to the weapon used to kill Mr. Van Allen. See Fleming v. State, 269 Ga. 245 (7) (497 SE2d 211) (1998). Accordingly, this enumeration of error cannot be sustained.

8. Appellant contends the trial court "abused its discretion in hamstringing the defense's presentation of its main theory of the case — that the police botched the investigation" — when it did not allow him to present evidence of a "vast number of leads" which he contends the police failed to fully investigate. We find no error. "A trial court's evidentiary rulings must be affirmed absent an abuse of discretion." Smith v. State, 292 Ga. 620 (5) (740 SE2d 158) (2013). The record shows the trial court allowed appellant to cross-examine the officers who investigated the case about a number of the investigation's more credible leads,[11] including a purported lead that a local

_____

[11]Appellant made a proffer of the evidence he wanted to present to the jury, including evidence of some thirty leads police received, evidence of Mr. Lynn's rumored illegal business activities (i.e., drug dealing, drag racing, and cock fighting), evidence of alleged physical altercations Mr. Lynn had prior to the murder, evidence that there was allegedly a hit on Mr. Lynn and Mr. Van Allen for an alleged dispute with the "Mexican Mafia," and evidence that people may have been angry with appellant for allegedly being an informant. Officer Tindale, who was the lead investigator in the case, testified that many of these leads and alleged activities were not credible, but were largely predicated on rumor and conjecture.

sheriff was a suspect in the case and a lead that a local man had threatened to shoot Mr. Lynn "down by the railroad tracks." This was in keeping with precedent:

> a defendant is entitled to introduce relevant and admissible testimony tending to show that another person committed the crime for which the defendant is tried. However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature.

Klinect v. State, 269 Ga. 570, 573 (3) (501 SE2d 810) (1998) (Citations omitted). The trial court, however, was not required to allow appellant to introduce evidence that was based purely on rumor, speculation, and conjecture. See id. Appellant's assertion that the trial court abused its discretion by stymieing his defense is simply not borne out by the record. Accordingly, this enumeration of error cannot be sustained.

9. Appellant contends the trial judge erred by failing to recuse himself. The record shows that during the guilt/innocence phase of the trial, appellant brought to the trial judge's attention his previous representation of a witness

18

who would be testifying during the sentencing phase of the trial.[12] At that time, appellant voiced a concern about the appearance of impropriety, but made no request for the trial judge to recuse himself. During the sentencing phase when the witness had already testified on direct and was in the midst of being cross-examined by appellant, appellant stated in a side-bar conference that he had an objection based on the trial judge's previous representation of the witness. Again, appellant made no motion for the trial judge to recuse himself and continued with his cross-examination of the witness. Appellant having failed to make any motion for recusal or otherwise requesting relief, and carrying on with his cross-examination, appellant failed to preserve this matter for review.[13] In re Adams, 292 Ga. 617 (1) (740 SE2d 134) (2013).

10. Appellant was indicted on two counts of malice murder and one count of armed robbery. However, upon being instructed by the trial court on the lesser offense of felony murder (aggravated assault) the jury elected to convict appellant of two counts of felony murder instead of malice murder. Appellant

---

[12] Apparently the trial judge had represented and prosecuted the witness in unrelated matters in the 1990s.

[13] The fact that the trial judge addressed the allegations of bias raised by appellant in its order denying appellant's motion for new trial does not alter the fact appellant has waived the recusal issue.

contends his armed robbery conviction should have merged into his felony murder conviction. We disagree. The jury was never given the option of convicting appellant of felony murder predicated on armed robbery, and the facts do not warrant such. Compare Briscoe v. State, 263 Ga. 310 (2) (431 SE2d 375) (1993) (where it was unclear which of two felonies — aggravated assault or armed robbery — was the underlying felony for a felony murder conviction, the trial court was required to merge the armed robbery conviction and sentence appellant for aggravated assault which carried a lesser penalty). Indeed, having taken the wallet from Mr. Lynn after shooting him in the back of the head, the armed robbery occurred separate and apart from the aggravated assault which was the basis of the felony murder count. See Drinkard v. Walker, 281 Ga. 211 (636 SE2d 530) (2006). Accordingly, the trial court did not err in sentencing appellant on his conviction for armed robbery.

11. Citing to United States v. Gaskell, 985 F2d 1056 (11th Cir. 1993), appellant contends his constitutional rights were violated due to the cumulative effect of errors made at trial. The appellate courts in this state do not ascribe to a cumulative error rule, Rice v. State, 292 Ga. 191 (11) (733 SE2d 755) (2012), and so this enumerated error is without merit.

Judgment affirmed. All the Justices concur.

Decided January 27, 2014 – Reconsideration denied March 3, 2014.

Murder. Glynn Superior Court. Before Judge Scarlett.

Christopher W. Adams, Stanley B. Young, Kevin R. Gough, Gabrielle A. Pittman, J. D. Blevins, for appellant.

Jacquelyn L. Johnson, District Attorney, Andrew J. Ekonomou, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General, for appellee.